**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Derrick JARRETT, Lawrence McCarroll, Jeffrey Brock, Jamie J. Key, Dwight Anderson, Samir Hameen, and Judy McCarroll, Defendants–Appellants.**

Nos. 96–2615, 96–2808, 96–2842, 96–2844, 96–2900, 96–2957, 96–2999, 96–3510, 96–3533 and 96–3534.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1997.

Decided Jan. 8, 1998.

520

Barry Rand Elden, Chief of Appeals, Daniel Howard Parish (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Kent R. Carlson (argued), Chicago, IL, for Defendant–Appellant Derrick Jarrett.

Chester Slaughter, Freddrenna M. Lyle, Lyle, Slaughter & Brewer, Chicago, IL, for Defendant–Appellant Lawrence McCarroll.

Joshua Sachs, Chicago, IL, for Defendant–Appellant Jeffrey Brock.

Jeffrey J. Levine (argued), Chicago, IL, for Defendants–Appellants Jeffrey Brock, Jamie J. Key.

Donald E. Joyce (argued), Chicago, IL, for Defendant–Appellant Dwight Anderson.

Cynthia Giacchetti (argued), Chicago, IL, for Defendants–Appellants Lawrence McCarroll, Samir Hameen.

Ellen R. Domph (argued), Chicago, IL, for Defendant–Appellant Judy McCarroll.

Before FLAUM, RIPPLE, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

Lawrence McCarroll and his associates based their drug enterprise in Chicago's Ida Wells housing complex. Over the thirteen-month period in which the Government monitored their activities, the conspirators bought, diluted, packaged, and sold vast quantities of heroin. A jury convicted all defendants after a lengthy trial, and the district court sentenced them to prison terms ranging from 235 to 328 months and entered a joint-and-several liability forfeiture order in excess of $3.3 million against all appellants except Jamie Key. This consolidated appeal challenges various aspects of each appellant's

conviction and sentence. We affirm the jury's verdicts and the district court's sentences.

## I. BACKGROUND

Lawrence McCarroll became known as the "King of Ida Wells" for the grand lifestyle he enjoyed amidst the poverty of that south-side housing project. Although he was only twenty years-old, he acted as the conspiracy's "CEO" and supervised purchases of high-purity heroin by his mother (Judy McCarroll) and Samir Hameen. Some of Lawrence's fellow conspirators—Derrick Jarrett, Dwight Anderson, Jamie Key, and Jeffrey Brock—would then dilute the heroin at a laboratory on the far south side of Chicago, package it into half-gram bags or multiple-gram packages, and then make the sales to customers at Ida Wells. Judy McCarroll served as the conspiracy's bookkeeper and, along with her son and two co-defendants who did not join this appeal, laundered the huge profits yielded from the conspiracy's sales. The conspiracy's success manifested itself in the expensive cars, fur coats, and jewelry possessed by the appellants.

These ostentatious displays of wealth tipped off law enforcement authorities to the conspiracy's activities. In December 1993, the Government began gathering evidence of the conspiracy's operations from surveillance agents, undercover purchasers, and items seized from the conspirators during arrests. The most prolific source of evidence, though, came from a wiretap which ran at different times from November 1994 until January 1995 and which recorded over 2500 calls among the coconspirators. In addition, the prison authorities at the Metropolitan Correctional Center recorded the appellants' post-arrest calls to outsiders in which the parties discussed, among other things, selling the conspiracy's assets in order to raise money for legal representation.

In the following sections, we summarize the extensive evidence of the conspiracy's illegal activities, describe the items seized during Appellants' arrests, and then discuss their convictions and sentences.

### A. Evidence of Illegal Activity

Law enforcement officials began to gather circumstantial evidence of the conspirators' criminal activities in late 1993. Members of the Chicago Police Department who patrolled Ida Wells testified to seeing Lawrence McCarroll, Brock, Anderson, Key, and Jarrett frequently conversing in small groups that would quickly disperse if approached. At trial, Chicago Housing Authority officers confirmed this description of the appellants' furtive actions. A CHA officer also remembered observing Lawrence McCarroll driving through the neighborhood around Ida Wells in a variety of cars, including a Toyota Land Cruiser, a Lexus, a Honda, a Pontiac Grand Am, and a Nissan Maxima. Police officers followed Lawrence McCarroll, Brock, and Jarrett to the conspiracy's laboratory in south Chicago and once photographed the group at that location.

The officers also observed more direct evidence of drug sales. One CHA officer, in particular, testified that he saw Key taking money from persons in exchange for small objects while Jarrett "looked out" for Key. Numerous police officers also testified to seeing Anderson, Key, and Jarrett handing small packages to customers in cars in exchange for money. An officer once retrieved one of these packages and found that it contained white powder.

Most dramatically, on October 21, 1994, a CHA officer observed an unindicted co-conspirator named "Sconey" at Ida Wells hawking heroin like hotdogs at a ball game. The "brand" name of the conspirators' heroin was "Thunder," and Sconey was observed yelling, "Thunder, Thunder, I got that whip!" For the benefit of other pushers, he would also yell out "Car 13" whenever a CHA car drove by and "Car 15" when a CPD vehicle approached. Sconey unwittingly approached a CHA officer's unmarked car and asked the officer if he wanted some Thunder. When the officer declined, Sconey asked him to move his car away so other customers could get theirs.

The conspirators also provoked suspicion of their activities in a number of confrontations with law enforcement officials. When stopped by police on December 30, 1993,

Appellant Anderson stated that he was unemployed and could not explain his possession of $4,252 in cash. Just three days later, Anderson was stopped again by police after he sat in a car near Ida Wells receiving money; Anderson took the police on a six-block car chase, but he was eventually apprehended and found to be carrying $4,150 in cash. Appellants Key and Brock also led police officers on a brief car chase on January 21, 1994. The two co-conspirators abandoned their car after crashing it and fled in different directions; a police officer caught Brock and found him in possession of $470 in cash. Four days after this incident, police stopped Anderson for traffic violations and found him carrying $390.

The conspirators continued to entangle themselves with the police throughout 1994. On April 3, a patdown search of Lawrence McCarroll and Anderson revealed over $650 in cash on McCarroll and over $1,000 in cash on Anderson. The next day, Anderson was again in trouble with the law. Upon seeing a CPD officer, Anderson threw a marijuana package to the ground and ran into his apartment. The officer chased Anderson into the apartment and discovered $12,750 cash in a pail, as well as 30–50 gym shoes and a great deal of designer clothing in Anderson's closet. Anderson was again stopped for a traffic violation on May 20, 1994, along with Derrick Jarrett; a pat-down of Jarrett found $1,220 in cash even though he stated that, like Anderson, he was unemployed.

Incidents like these convinced law enforcement officials that the conspirators were operating an enormous drug enterprise out of the Ida Wells complex. The Joint Task Force on Gangs, an interagency unit headquartered in the F.B.I.'s Chicago office, installed wiretaps on the conspirators' phones. The conversations secretly taped in late 1994 provided some of the most incriminating evidence against the appellants. The wiretaps recorded countless calls in which the conspirators updated each other on the progress of their heroin sales on the street, called for more heroin to be delivered to those sellers, discussed "cutting" (diluting) high-purity heroin, and instructed each other about where to deposit the proceeds of their drug sales.

The Task Force's wiretaps operated from November 14 until December 22, 1994, and ran again from January 1 until appellants' arrests on January 23, 1995.

In particular, the wiretaps captured incriminating conversations among the conspirators regarding their purchases of large amounts of high-purity heroin (which they, in due course, would dilute at their laboratory and sell in small increments at Ida Wells). Appellant Samir Hameen spoke with Lawrence McCarroll on December 3, 1994, about paying $12,500 for one hundred grams of heroin. One week later, Lawrence McCarroll and Hameen agreed to "take care of some business" that day, and then later complained about the way in which their heroin supplier had driven a hard bargain. Hameen and Lawrence McCarroll spoke again on December 18 about their need to buy more heroin from their wholesale seller before Christmas. Calls from a three-week period showed that the conspiracy regularly bought many hundreds of grams of highgrade heroin.

The wiretaps also provided evidence of a wholesale purchase on January 15, 1995, just before law enforcement officials arrested the conspirators. Accompanied by Judy McCarroll and Lawrence McCarroll's young son, Hameen drove to a meeting at which he tried to purchase more than 500 grams of high-purity heroin from "Sam," the conspirators' wholesale seller; Sam only had 500 grams available but said that he would have more heroin the next day. Over a cellular phone, Lawrence instructed Hameen to pay $58,000 for the 500 grams. Hameen later reported to Lawrence over the phone that Sam had stated that this amount was insufficient and had insisted on their usual rate of $12,500 per 100 grams. Hameen told Lawrence that he had promised to bring the additional money to Sam at their next purchase and had overcome Sam's reluctance by reminding him that "they had been doing this for over a year" and that they were regular customers who came back to him "like milkmen." While driving back from this purchase, police officers stopped Hameen and Judy McCarroll, who successfully concealed the half-kilogram of heroin by sticking it under her shirt

and holding her crying grandson close to her chest. Soon thereafter, Judy McCarroll reported the incident to her son in a recorded conversation in which she declared that her quick thinking was a product of divine intervention.

The wiretap evidence was corroborated by a series of purchases by the Government's informant, Fred Kinnie. Kinnie purchased heroin of varying degrees of purity from Appellant Brock on six separate occasions from July 21 to December 8, 1994. Kinnie bought six grams of heroin for $1,800 on July 21 and Brock informed him that the heroin could be diluted eight to ten times; the Government later determined that this heroin was 69% pure. Kinnie acquired another six grams of heroin for $1,800 on August 19, but this time the heroin was 83% pure. In making his third purchase at Ida Wells on September 5, Kinnie had to ask Appellant Jarrett where to find Brock. He followed Jarrett's directions and made a third purchase of six grams of 57%-pure heroin for $1,800; Kinnie observed Brock hand the $1,800 immediately to Appellant Key. Kinnie once more bought six grams for $1,800 on September 30, whereupon Brock told Kinnie that he could handle sales up to 250 grams if Kinnie desired more heroin. The heroin at this fourth purchase was 61% pure. At the fifth purchase on November 11, Kinnie bought seven grams for $2,000 and this heroin tested at 61%-pure (the same level as the heroin of the fourth purchase). Finally, Kinnie made his last and largest purchase on December 8. He bought ten grams of 43%-pure heroin and a "G pack," which contained fifty, half-gram packages of heavily-diluted heroin (7.7% purity). The ten grams sold for $2,500, while the "G pack" cost Kinnie $1,000.

Further information about the conspiracy's activities was provided by Linda Davis, a resident at Ida Wells who allowed the appellants to store drugs and money in her apartment in exchange for money. The conspirators referred to Davis as "Miss D" in a number of recorded phone calls. In August 1994, for example, Appellant Key gave her a plastic bag of ten- and twenty-dollar bills packaged in rubber bands; Appellant Anderson later came to retrieve this package from her. Davis testified at trial that Appellants Jarrett and Brock also followed this practice of depositing packages of rubber-banded cash with her regularly.

The conspirators flaunted their newfound wealth to their neighbors, but they went to great lengths to hide it from the Government. Four of the appellants—Judy McCarroll, Lawrence McCarroll, Dwight Anderson, and Jeffrey Brock—did not file income tax returns for the years 1990–1994. The McCarrolls took charge of laundering much of the conspiracy's profits. Telephone wiretaps in January 1995 recorded Lawrence and Judy discussing the purchase of a $150,000 apartment building and over $25,000 of jewelry. Teresa Howard (a co-defendant who did not appeal her conviction or sentence) bought three cars with cash for Judy McCarroll and helped funnel the conspiracy's drug money into other legitimate assets. Also, a man named Angelo Evans purchased two expensive cars with cash provided by Lawrence McCarroll within a two-month period in late 1993. Just prior to his arrest, Lawrence McCarroll was negotiating with Evans over the cash purchase of a luxury sedan that was to be a birthday present for Judy McCarroll.

### B. Arrests and Seizures of Evidence

Police arrested all of the appellants on January 23, 1995, with the exception of Appellant Anderson, who was incarcerated at the Menard Penitentiary. Lawrence McCarroll and Jeffrey Brock attempted to escape arrest by both car and foot. When they were apprehended, Lawrence McCarroll was wearing a $3,500 mink coat, thousands of dollars worth of jewelry, and possessed $328 in cash; Brock had approximately $450 on his person. Lawrence McCarroll admitted that he was surprised how much information the F.B.I. had about the conspiracy's operations, and he offered to lead the Government to Sam, the conspiracy's wholesale supplier. Police found Derrick Jarrett at Ida Wells holding over $500 cash and wearing $700 worth of jewelry. A CHA officer arrested Judy McCarroll and Hameen and seized

499.4 grams of 70%-pure heroin, $2,750 in cash, and a gold bracelet worth nearly $1,500.

Concurrent with these arrests, law enforcement officials executed four search warrants on apartments controlled by the appellants. One of these apartments—the conspiracy's laboratory in South Chicago—contained hundreds of plastic baggies, cooking materials, lactose containers (lactose is used to dilute high-purity heroin), razor blades, "cooking" recipes, and a white powder residue throughout the apartment that tested positive for heroin. In another apartment, Government agents found an invoice for a $3,300 fur in Hameen's name, a scale, records of drug sales, and about $850 in cash. The search of Lawrence McCarroll's home revealed approximately $45,000 worth of receipts (tracing the conspiracy's laundered funds). Lastly, at Judy McCarroll's house, agents found a receipt for a fur appraised at almost $15,000 and a $5,500 fur (in which "Judy McCarroll" was embroidered).

The most important item seized from Judy McCarroll's house, however, was the conspiracy's complex bookkeeping system. An experienced F.B.I. agent, Daniel Clouse, explained this system to the jury at trial. The appellants kept track of their enormous cash flow through terminology like "flats," "folds," and "stacks." The conspirators used these same terms in their phone conversations with each other. The papers kept by Judy McCarroll indicated that the appellants sold most of their product in $20, half-gram packages. Agent Clouse testified that these documents, which concerned discrete periods of time (October 20, 1993, to April 8, 1994, and June 3 to July 23, 1994), evidenced over $700,000 in sales. The conspiracy's total sales, according to Agent Clouse, probably would be exponentially greater than this figure because the seized documents covered only a limited period of time and only a limited scope of the drug operation within that period.

### C. Verdicts and Sentences

Appellant Key had not yet attained the age of eighteen at the time of his arrest. He turned eighteen in May 1995, and, pursuant to 18 U.S.C. § 5032, the Government moved to transfer him to adult status on August 4, 1995. The district court granted that motion in September, and Key immediately appealed to this Court. On the last day of his trial, February 14, 1996, we held that an order issued under § 5032 is immediately appealable as a collateral order but that Key's appeal was moot for a variety of reasons. *United States v. J.J.K.*, 76 F.3d 870, 871–72, 873 (7th Cir.1996).

After a month-long trial, the jury returned the following convictions: (1) Lawrence McCarroll, Jeffrey Brock, Derrick Jarrett, Judy McCarroll, Samir Hameen, Dwight Anderson, and Tamara Cumbo were guilty of conspiracy to possess heroin with intent to distribute in violation of 21 U.S.C. § 846; (2) Lawrence McCarroll was guilty of sixteen counts of possessing heroin with intent to distribute in violation of 21 U.S.C. § 841; (3) Jamie Key was guilty of ten counts of possessing heroin with intent to distribute in violation of 21 U.S.C. § 841; (4) Jeffrey Brock was guilty of eighteen counts of possessing heroin with intent to distribute in violation of 21 U.S.C. § 841; (5) Judy McCarroll and Samir Hameen were each guilty of two counts of possessing heroin with intent to distribute in violation of 21 U.S.C. § 841; (6) Derrick Jarrett was guilty of seven counts of possessing heroin with intent to distribute in violation of 21 U.S.C. § 841; (7) Judy McCarroll was guilty of one count of using a minor to avoid detection of a narcotics crime in violation of 21 U.S.C. § 861; (8) Lawrence McCarroll and Judy McCarroll were each guilty of one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Teresa Howard pleaded guilty to one count of this charge); (9) Judy McCarroll was guilty of four counts of money laundering in violation of 18 U.S.C. § 1956; (10) Lawrence McCarroll was guilty of six counts of money laundering in violation of 18 U.S.C. § 1956; and (11) Tamara Cumbo was guilty of one count of money laundering in violation of 18 U.S.C. § 1956.

The district court sentenced the defendants in June and July of 1996. From a range of 360 months to life, the court sentenced Lawrence McCarroll to 396 months

imprisonment. From a range of 293 to 365 months, the court sentenced Jeffrey Brock to 320 months imprisonment. From a range of 262 to 327 months, the court sentenced Dwight Anderson to 270 months imprisonment. From a range of 324 to 405 months, the court sentenced Samir Hameen to 324 months imprisonment. From a range of 292 to 365 months, the court sentenced Judy McCarroll to 328 months imprisonment. From a range of 235 to 293 months, the court sentenced Derrick Jarrett to the minimum 235 months imprisonment. Finally, from a range of 235 to 293 months, the court sentenced Jamie Key to 240 months imprisonment. Appellants waived a jury on the forfeiture charges and the district court ordered forfeiture jointly-and-severally against all appellants (except Key) in the amount of $3,341,045.20.

## II. DISCUSSION

Appellants' consolidated brief raises three issues on appeal: (1) whether the district court should have excluded certain post-arrest conversations recorded when the appellants were incarcerated, (2) whether the district court erroneously set the appellants' "relevant conduct" at 75.4 kilograms of heroin, and (3) whether the district court erred in issuing its forfeiture order in excess of three million dollars. Many of the appellants raise separate claims in addition to these three questions. Four of the appellants—Hameen, Judy McCarroll, Jarrett, and Key—contend that, even if the conspiracy's relevant conduct was 75.4 grams, the district court should not have attributed the full amount of heroin to them for sentencing purposes. Three of the appellants—Anderson, Hameen, and Key—argue that the Government did not prove their guilt beyond a reasonable doubt. Judy McCarroll admits that we cannot review the district court's refusal to grant a downward departure on her sentence based on an extraordinary physical impairment or an unfairly high criminal history category, but she asks us to do so anyway. Finally, Jamie Key challenges his transfer to adult status and argues that, if the transfer was appropriate, the jury convicted him of crimes not cognizable against a juvenile transferred to adult status under 18

U.S.C. § 5032. We consider these arguments in turn.

### A. Issues Raised by Appellants' Consolidated Brief

#### 1. Post–Arrest Conversations

■ Appellants object to the district court's decision to admit into evidence five telephone conversations recorded while the appellants were incarcerated. As stated earlier, all of the appellants except Dwight Anderson were arrested on January 23, 1995, and the Government recorded their telephone conversations from prison during the next two days. The district court admitted five of these recorded conversations against all appellants pursuant to Federal Rule of Evidence 801(d)(2)(E), which exempts from the definition of hearsay "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Appellants contend that the challenged conversations did not meet the requirements of Rule 801(d)(2)(E) and, therefore, should have been excluded.

Appellants labor mightily to show how these conversations were unrelated to the conspiracy's criminal goals. The appellants were incarcerated, they say, and there was no longer a conspiracy of which they could have been acting "in furtherance." *But see, e.g., United States v. Zarnes*, 33 F.3d 1454, 1468 (7th Cir.1994) (stating that the defendant's incarceration did not establish her withdrawal from a conspiracy), *cert. denied*, 515 U.S. 1126, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995); *United States v. Patel*, 879 F.2d 292, 294 (7th Cir.1989) (stating that the defendant's cooperation with law enforcement authorities did not constitute withdrawal from a conspiracy). Two of the recorded conversations occurred between Lawrence McCarroll and his girlfriend, Tamara Cumbo, a co-defendant in this case who did not join this appeal. The third conversation, between Jeffrey Brock and an unknown person, concerned raising money for bond by selling assets of the conspiracy. A fourth conversation involved a number of parties—Lawrence McCarroll, Tamara Cumbo, Jamie Key, Angelo Evans, Theresa Howard, and an attor-

ney—and discussed which of the conspiracy's assets had been seized by the Government and how the remaining assets could be sold to fund the appellants' defense. Finally, the fifth conversation was between Derrick Jarrett and an unknown person named Darryl in which they discussed the assets seized by the Government and the appellants' arrests. According to the appellants, these five conversations concerned "mere idle conversation", "narrative declarations", and "discussions of past events." Appellants' Consolidated Br. at 20, 21, 22.

■ Even if we were inclined to agree with Appellants' innocent interpretation of these conversations (which we are not), the victory for the appellants would be Pyrrhic. Their vigorous protestations on the trivial nature of the conversations only serves to convince us that admitting the statements was among the most harmless of trial errors. An evidentiary error does not justify reversing a jury's verdict unless a reviewing court determines that the error had "a substantial and injurious effect or influence on the jury's verdict." *United States v. Hanson*, 994 F.2d 403, 407 (7th Cir.1993) (quotation omitted); *see also United States v. Westbrook*, 125 F.3d 996, 1003 (7th Cir.1997); *United States v. Sargent*, 98 F.3d 325, 330 (7th Cir.1996); *United States v. Santos*, 20 F.3d 280, 286 (7th Cir.1994). Appellants argue that the conversations were merely irrelevant chatter but then do not carry their burden of demonstrating that the conversations impacted the jury's decisions in any way. The Government presented an avalanche of incriminating evidence against the appellants, and we cannot realistically conclude that these five disputed conversations were the lynchpin in the month-long prosecutions. Rather, the conversations are just what the appellants say they are: harmless.

## 2. Determining the Conspiracy's Total Heroin Distribution for Sentencing and Forfeiture Purposes

The district court's calculation of the conspiracy's total heroin distribution formed the basis of two important decisions. First, this figure established the appellants' base offense levels under the Sentencing Guidelines.

Second, it determined the amount of unrecovered narcotics proceeds that they were ordered to forfeit to the Government pursuant to 21 U.S.C. § 853. Law enforcement officials seized just over one kilogram of heroin from the appellants, but the evidence presented at trial indicated that this kilogram was merely a drop in the bucket of the conspiracy's total distribution. Application Note 12 to USSG § 2D1.1 mandates that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." Based on this statutory command, Judge Coar computed a total amount of 75.4 kilograms, which placed the appellants at base offense level 38. Judge Coar also used the total distribution figure to fashion a joint-and-several liability forfeiture order against all appellants (except Jamie Key) in the amount of $3,341,045.20.

Judge Coar based his quantity computation upon recorded conversations among the co-conspirators, their bookkeeping records, and informant testimony, as well as the average purities and weights of the heroin purchased by the Government's informant over a six-month period. The district court took note of Samir Hameen's recorded statements to the conspiracy's wholesale supplier that "we come prob[ably] four, maybe three, four times in one month" and that "we've been doing this for over a year ... we come back regular, like milkmen." Despite concluding that Hameen's recorded statements, by themselves, did not prove the number of the conspiracy's wholesale purchases, the court considered the statements along with all other evidence at trial to estimate a figure of three wholesale purchases every month for at least one year (thirty-six total purchases). The court set the purity of this heroin at 70%, based on the facts that the heroin seized on Samir Hameen at his arrest was 70% pure and that an expert witness at trial testified that large quantities of heroin of this sort were usually 70–90% pure. The court found that the conspiracy bought approximately 500 grams at each wholesale purchase based on the amount seized on Hameen at the time of his arrest (500 grams) and recorded conversations in which the conspirators discussed purchasing 500 grams from

Sam. This yielded a total figure of 18 kilograms (36 purchases of 500 grams).

The court gleaned from these purchases the total amount of heroin distributed by the conspiracy. The sales fell into two general categories: high-purity, multi-gram packages and low-purity, half-gram packages. Judge Coar used the purchases of the Government's informant, Fred Kinnie, as a good, average sample of the purity of the heroin in the two different categories. The multiple-gram packages, by weighted average, were 56.5% pure, while the half-gram packages averaged only a 7.7% purity; because the conspiracy purchased 70%-pure heroin, these averages indicated that the appellants diluted multi-gram packages by a factor of 1.24 and diluted the half-gram packages by a factor of 9. The latter figure was corroborated by Appellant Brock's statement to Kinnie that the multi-gram heroin packages could be diluted approximately eight to ten times before resale.

The court then estimated the amount of each type of sale by again using Kinnie's undercover purchases as a baseline. Sixty-two percent of these buys, by weight, involved multiple-gram packages (44.1 grams), and thirty-eight percent were in half-gram increments (25 grams). Based on the 18,000 grams of heroin purchased by the conspiracy, the district court determined that 62% (11,160 grams) went to multi-gram sales and 38% (6,840 grams) was resold in half-gram packages. The court then multiplied these subtotals by the respective dilution factors (11,160 multiplied by 1.24 = 13,838.4 grams, and 6,840 multiplied by 9 = 61,560 grams) and added the two subtotals together to reach the total amount of heroin distributed by the conspiracy (61,560 grams + 13,838.4 grams = 75,398.4 grams = 75.4 kilograms).

Likewise, the court determined the amount of forfeiture under 21 U.S.C. § 853 by multiplying the two categories of sales by their average sale prices (as reflected in the sales to Kinnie, the conspiracy's bookkeeping ledgers, and the appellants' recorded telephone conversations). Half-gram packages sold for $20 each; thus, the 61,560 grams yielded $2,462,400 in proceeds. The appellants sold multi-gram packages, on average, to Kinnie at $253 per gram; those sales of 13,838.4

grams, therefore, yielded $3,501,115.20 in proceeds. The court added these two subtotals together ($5,963,515.20), but then subtracted the purchase price of the 18 kilograms of heroin ($2,250,000) and the value of the appellants' seized property ($372,470). This produced a total forfeiture figure of $3,341,045.20.

The Government was required to prove the total amount of heroin distributed by the conspiracy for sentencing and forfeiture purposes by a preponderance of the evidence. *See United States v. Magana*, 118 F.3d 1173, 1205 (7th Cir.1997); *United States v. Howard*, 80 F.3d 1194, 1202 (7th Cir.1996). The calculation of this amount is a factual determination that we review only for clear error. *See United States v. Edwards*, 115 F.3d 1322, 1325 (7th Cir.1997); *United States v. Robinson*, 96 F.3d 246, 252 (7th Cir.1996). Appellants correctly point out that a district court cannot base its calculation on pure speculation or "nebulous eyeballing" of the conspiracy's activities. *United States v. Duarte*, 950 F.2d 1255, 1265 (7th Cir.1991), *cert. denied*, 506 U.S. 859, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992). There must be some room for speculation and reasonable estimation, however, because USSG § 2D1.1 mandates that "courts *shall* approximate the quantity of the controlled substance" (emphasis added) when the amount seized does not reflect the true scale of the offenders' activities. Appellants are simply mistaken in their belief that only the amount of heroin actually seized by law enforcement officials can be used to determine their sentences. Courts should indeed proceed cautiously when making quantity determinations, but the Sentencing Guidelines do not allow courts to blind themselves to a large-scale drug conspiracy's activities over a long period of time.

Judge Coar's approximations in this case were conservative and fit comfortably within our precedent. The percentages and quantities were not pulled out of thin air, like those figures criticized in *United States v. Henderson*, 58 F.3d 1145, 1152 (7th Cir.1995). *See also United States v. Sepulveda*, 15 F.3d 1161, 1197 (1st Cir.1993), *cert. denied*, 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994) (vacating sentence based on unsup-

ported average drug quantities and number of smuggling trips). Rather, the purity multipliers were based on heroin actually purchased from the appellants, and the amount of heroin purchased by the conspiracy was revealed by the appellants themselves in recorded telephone conversations. The prices per unit were based on a series of actual sales to an undercover operative over a five-month period. This case is unlike *United States v. Shonubi*, 998 F.2d 84, 89–90 (2d Cir.1993), in which the district court simply multiplied the quantity of drugs seized in one smuggling trip by the total number of trips. Here, Judge Coar made his determinations based on a series of undercover purchases made over a five-month period, as well as the appellants' own admissions in recorded conversations regarding their activities. This case is much more closely related to decisions such as *United States v. Golden*, 102 F.3d 936, 944 (7th Cir.1996), *United States v. Taylor*, 72 F.3d 533, 542 (7th Cir.1995), and *United States v. Ferguson*, 35 F.3d 327, 333 (7th Cir.1994), *cert. denied*, 514 U.S. 1100, 115 S.Ct. 1832, 131 L.Ed.2d 752 (1995), in which we approved a district court's use of representative dollar and drug amounts transacted during an average day, average drug prices, and an approximate number of days of a conspiracy's operations.

Not only were the district court's calculations reasonable, they were very generous to the appellants. Judge Coar easily could have determined from the evidence at trial that even more than 38% of the conspiracy's distribution was through half-gram packages. Agent Clouse's interpretation of the conspiracy's bookkeeping records, for instance, suggested that the appellants distributed more than 38% of their heroin in small amounts. With the large multiplier connected to these low-purity sales, the total quantity of heroin would have skyrocketed. Furthermore, the district court calculated the conspiracy's activities over a twelve-month period even though seized bookkeeping records showed that the conspiracy operated for at least fourteen months. It is important to note, as a final matter, that even with these conservative calculations, the quantity of heroin attributed to the conspiracy was *over two-and-a-half* times the maximum amount (30 kilo-

grams) addressed by the Sentencing Guidelines; any quantity of heroin above 30 kilograms falls under base offense level 38. The appellants are simply unable to convince us that the district court clearly erred in its quantity determination of 75.4 kilograms, much less that the court instead should have found the amount to be less than 30 kilograms. Thus, the district court's sentences and forfeiture order must stand.

### B. Attribution Claims

■■■ Four of the appellants—Hameen, Judy McCarroll, Jarrett, and Key—claim that the district court should not have held them responsible for the full 75.4 kilograms of heroin distributed by the conspiracy. Our circuit holds a conspirator responsible for the amount of drugs that conspirator actually distributes, as well as for any quantity distributed by the conspiracy that was reasonably foreseeable to the conspirator. *See Magana*, 118 F.3d at 1205; *United States v. McMillen*, 8 F.3d 1246, 1253 (7th Cir.1993), *cert. denied sub nom. Raji v. United States*, 511 U.S. 1071, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994); *see also United States v. Garcia*, 66 F.3d 851, 860–61 (7th Cir.1995) ("[T]hose convicted of conspiring to violate the drug laws are criminally responsible for the total quantity of drugs in which the conspiracy they joined can reasonably be estimated to have dealt.") (quotation omitted). Similarly, USSG § 1B1.3(a)(1)(B) holds a defendant accountable for all drugs distributed by a conspiracy that were reasonably foreseeable, and therefore attributable, to the defendant. *Cf.* USSG § 1B1.3, comment. (n.2) ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct. . . ."). This determination of reasonable foreseeability is a factual determination and is therefore reviewed under the same deferential, "clearly erroneous" standard as our previous inquiry. *See McMillen*, 8 F.3d at 1250.

The district court's attribution of the full amount of heroin to each appellant is supported by substantial evidence in the record. Judy McCarroll was integral to the appellants' criminal scheme. She recorded the

flow of heroin and money throughout the life of the conspiracy in a number of bookkeeping ledgers. In addition, she draped herself in the fruits of the conspiracy's business-expensive furs, jewelry, luxury cars, and the like—and oversaw the efforts to launder its plentiful profits. It was not clearly erroneous to find that she knew the full scope of the conspiracy's distribution activities and should therefore be held responsible for that full amount.

Similarly, Samir Hameen cannot now profess ignorance of the scope of the conspiracy's operations. He dated Judy McCarroll and had a close relationship with her son Lawrence, both of which suggest an awareness of the full scope of the conspiracy's illegal activities. More importantly, Hameen was the member of the conspiracy in charge of keeping a steady stream of wholesale heroin flowing into the conspiracy's lab so that the street vendors could service their clients at Ida Wells. This involved making huge buys three to four times per month. It was reasonably foreseeable, if only from a common sense perspective, that the high-purity heroin would be diluted and resold in varying amounts. *See id.* at 1253 (holding that a conspirator who purchased large amounts of high-purity heroin was not so naive about the mechanics of the conspiracy's distribution scheme that he could not foresee that co-conspirators would dilute the heroin prior to selling it on the street). The Government need not tie a conspirator to each transaction so long as the conspirator could reasonably foresee that the transactions would occur. The district court did not clearly err in attributing the full 75.4 kilograms to Hameen.

Appellant Jarrett argues that the Government did not produce evidence of his involvement in the conspiracy until November 1994. Therefore, because the Government busted the conspiracy in January 1995, he contends that the district court clearly erred in attributing to him the full amount of heroin distributed by the conspiracy for a full twelve months. The district court admitted that most of the wiretap references to Jarrett occurred during the later part of the conspiracy, but noted that the Government's wiretap began operating in November 1994 and that, therefore, the first references to *all* appellants occurred at that time. The court found that Jarrett's expressed familiarity with the conspiracy's operations in these recorded conversations, as well as his intensive involvement in the conspiracy during that period of time, implied an earlier involvement. The district court's finding is supported by a police stop in May 1994 in which Jarrett was found with $1220 in cash and by Linda Davis's testimony that Jarrett stored money in her apartment throughout the summer of 1994. Also, testimony from various police officers placed Jarrett among a group of "look-outs" at Ida Wells long before his first recorded telephone conversation. Based on this evidence, the district court found that Jarrett was a member of the conspiracy throughout its fourteen-month life and should be held responsible for all of its activities. This finding was not so lacking in foundation as to be clearly erroneous.

At the time of the conspiracy's activities, Appellant Jamie Key was less than eighteen years old. The district court granted the Government's motion to transfer Key to adult status in accordance with 18 U.S.C. § 5032. This transfer statute, however, does not permit the Government to charge a juvenile with conspiracy; thus, the jury could only convict Key of numerous possession charges. The jury returned convictions on all of these charges against Key. At sentencing, the district court found that Key was an integral member of the conspiracy and, even though he could not be convicted of conspiracy charges, the court attributed to him the full amount of heroin distributed by the conspiracy. Key contends that the legislative judgment that juveniles cannot be convicted of conspiracy should likewise preclude courts from attributing a conspiracy's drug sales to a juvenile member for sentencing purposes.

We disagree with Key's interpretation of the relevant statutes and sentencing guidelines. Once the district court transferred him to adult status, Key became subject to the rule—like any adult offender—that the court should consider all of his relevant conduct for sentencing purposes. Section

1B1.3(a)(1)(B) of the Sentencing Guidelines directs courts to appraise

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, *whether or not charged as a conspiracy*) all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

(Emphasis added). Thus, if a juvenile defendant was involved in a criminal conspiracy, the Guidelines command a judge to look past the actual charges brought against the juvenile; the inquiry focuses solely on whether the conspiracy's distribution activities were reasonably foreseeable to the defendant. In such a situation, courts can take the conspiracy's conduct into account regardless of whether the defendant was not (or, in this case, could not be) actually charged with conspiracy. *See also* USSG § 1B1.3, comment. (n. 10) ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."); *United States v. Taylor*, 72 F.3d 533, 541 (7th Cir.1995) (attributing a conspiracy's full drug distribution quantity to a defendant convicted only of attempted possession with intent to distribute cocaine).

■■■ There was abundant evidence in the record that Appellant Key was a trusted and valuable member of the conspiracy's drug operations from its inception. Lawrence McCarroll had obtained the rank of "governor" within the Gangster Disciples Nation, and he attended regular board meetings of the gang at which all the governors from other areas reported on the financial status of their drug businesses. When Lawrence McCarroll could not attend one of these regular governors' meetings, he would often send Key as the conspiracy's representative. This is not the kind of heavy responsibility normally given to a "low level functionary" in an organization. *Compare* Br. of Appellant Key at 19. In addition, the Government presented countless telephone calls in which Key informed other members of the conspiracy about the current status of the day's heroin sales. In just the limited periods of time that the Government's wiretaps operated, Key frequently reported to Lawrence McCarroll about his plans to deposit the conspiracy's daily profits, to bring more heroin to the street vendors at Ida Wells, and to go to the conspiracy's lab with supplies for diluting a large quantity of high-purity heroin. We cannot say that the district court clearly erred in finding that Key reasonably foresaw the total quantity of heroin distributed by the conspiracy and should therefore be sentenced on that basis.

### C. Sufficiency Challenges

■■■ Appellants Hameen and Anderson claim that the Government did not present sufficient evidence of their guilt on the charge of conspiracy to possess with the intent to distribute heroin. In order to prove that Anderson and Hameen were members of the charged conspiracy, the Government was required to prove that they knew of the conspiracy and that they intended to join and associate themselves with the conspiracy's criminal purposes. *See United States v. Santos*, 20 F.3d 280, 283 (7th Cir.1994). We will only reverse the appellants' convictions for insufficient evidence if, after reviewing the evidence in the light most favorable to the Government, we conclude that no rational jury could have found them guilty beyond a reasonable doubt. *See United States v. Laurenzana*, 113 F.3d 689, 692 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 240, —— L.Ed.2d —— (1997); *United States v. Lindemann*, 85 F.3d 1232, 1237 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996). Both appellants fall far short of that demanding standard.

The Government used Hameen's own words to show that he purchased the conspiracy's wholesale heroin on a regular basis for over a year. He compared himself in these recorded conversations to a Wall Street investor who had long-term investments in the drug business. The large quantity and high purity of the heroin that he purchased, as well as his close relationship with the McCar-

rolls, suggest that he knew the conspiracy was engaged in a profitable dilution and resale operation. Furthermore, Hameen enjoyed the jewelry, cash, and fur that only could have come from profitable sales; he cannot now feign ignorance of the source of those accoutrements. He definitely knew that a conspiracy existed, and he actively associated himself with its activities.

■ The Government also presented sufficient evidence of Appellant Anderson's guilt. Some of the earliest evidence of the conspiracy's criminal activities came from the large amounts of cash seized from Anderson. Later, after Anderson went to prison on state drug charges on October 21, 1994, he still spoke to members of the conspiracy, gave them advice on ways to continue to profit in the drug trade, and expressed his continuing association with their illegal efforts. Wiretap evidence revealed Anderson's encouragement of the conspiracy's activities; on one occasion, Anderson urged Lawrence McCarroll to "[k]eep it going, man. It's the only thing." In other conversations, Anderson agreed to work out a rift between Appellants Key and Jarrett, he advised Key on ways to avoid government surveillance of drug sales, and Lawrence McCarroll kept Anderson abreast of the conspiracy's new sales locations and profits. Lawrence McCarroll spoke in a recorded conversation about funding Anderson's $15,000 legal defense. Also, Linda Davis testified that Anderson picked up drug proceeds in her apartment that Appellant Key deposited there. Finally, several Chicago police officers testified that Anderson was always in the company of Appellants Key and Brock at the same locations at Ida Wells. A rational trier of fact could find that Anderson actively associated himself with the conspiracy's activities. His imprisonment severed only his physical connection with his co-conspirators; he still maintained an active association with the conspiracy from behind bars.

■ Finally, Appellant Key argues that the Government's evidence at trial did not sufficiently demonstrate that he actually possessed heroin with intent to distribute. The jury convicted Key of ten counts of this charge based largely on recorded phone conversations in which Key reported, as described earlier, to Lawrence McCarroll about the progress of the conspiracy's drug sales at Ida Wells. Although the Government did not produce direct evidence of Key possessing drugs, the jury was allowed to make reasonable inferences based on the evidence presented to them. The jury could infer that Key possessed heroin with the intent to distribute it when he stated in secretly recorded telephone calls that he currently was holding drugs and drug proceeds. In addition, jurors could interpret the meanings of this and other phone calls in light of police officer testimony that Key was often seen with his co-conspirators in suspicious scenarios around Ida Wells; an officer once spotted Key receiving money in exchange for small objects and, after being chased by the officer, Key dropped a small bag with numerous packages filled with white powder. Key's assertions that he merely held the conspiracy's money did not fall on deaf ears; the jury acquitted Key of one possession charge for which it could not find beyond a reasonable doubt that he actually possessed heroin rather than merely drug proceeds. Key's sufficiency claim, in its essence, merely invites us to disagree with the jury's reasonable inferences. This we cannot do.

### D. Sentencing Departures

■ Appellants Judy McCarroll and Samir Hameen ask us to review the district court's refusal to downwardly adjust their sentences on various grounds. Judy McCarroll argues that the district court should have downwardly departed both under USSG § 4A1.3 because her criminal history category overstated the seriousness of her prior conduct and under § 5H1.4 because of her medical problems. Both Judy McCarroll and Hameen claim that they should have received a reduced sentence because they were less culpable than the other members of the conspiracy. None of these claims is compelling.

■ We can dispose of Judy McCarroll's individual claims in short order. Under the Sentencing Guidelines, a sentencing court may exercise its discretion to reduce a defendant's sentence through a number of different downward departures. Judy McCarroll

asked the district court for a reduced sentence pursuant to two such Guidelines: § 4A1.3, which permits downward departure if the defendant's criminal history misrepresents the seriousness of a defendant's past criminal conduct, and § 5H1.4, which allows a downward departure if a defendant's "extraordinary physical impairment" mitigates in favor of a shorter prison sentence than that commanded by the defendant's base offense level and criminal history category. Judge Coar refused to exercise his discretion to reduce Judy McCarroll's sentence on these two grounds. We have no jurisdiction to review such a refusal unless it resulted from the sentencing court's erroneous belief that it lacked statutory authority to depart. *See United States v. Larkins*, 83 F.3d 162, 168 (7th Cir.1996); *United States v. Poff*, 926 F.2d 588, 590 (7th Cir.) (en banc), *cert. denied*, 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991). In this case, Judge Coar did not deem himself without authority to depart; rather, he simply did not credit Judy McCarroll's proffered justifications for the departures. Thus, our review of the matter is finished.

■ Both Judy McCarroll and Hameen argue that they are entitled to downward adjustments as minor or minimal participants in the conspiracy. Section 3B1.2 of the Guidelines allows a reduction of two to four levels when the defendant was a minor or minimal participant in the charged criminal activity. The application notes to this section state that this adjustment should be used infrequently and only for defendants who are plainly among the least culpable of those involved in a group's criminal activity. *See* USSG § 3B1.2, comment. (n. 1 & 2). We will only reverse a clearly erroneous denial of a downward adjustment under this section. *United States v. Bolin*, 35 F.3d 306, 310 (7th Cir.1994). Our previous discussions of these appellants' crucial roles and substantial involvement in the conspiracy's operations adequately explains our conclusion that they are not entitled to a reduction under § 3B1.2. Even assuming *arguendo* that Judy McCarroll and Hameen were indeed less culpable participants, we would still deny their request for a downward adjustment because they both played an integral role in the conspiracy—Judy as bookkeeper and primary money launderer, and Hameen as the conspiracy's sole buyer of wholesale, high-purity heroin. *See United States v. Smith*, 80 F.3d 215, 222 (7th Cir.1996) ("[A] denial of a reduction [under § 3B1.2] will be upheld even in the case of a less culpable person when that less culpable person played an integral part in a conspiracy.") (citing *United States v. Osborne*, 931 F.2d 1139, 1159 (7th Cir. 1991)).

The district court, therefore, properly denied Judy McCarroll and Samir Hameen's requests for downward departures from their Guideline-mandated sentences.

### E. Federal Jurisdiction Over Jamie Key

■ Juveniles may not be tried for federal crimes until they are transferred to adult status pursuant to the Juvenile Justice and Delinquency Act, 18 U.S.C. §§ 5031–42. A transfer is approved in four steps. First, 18 U.S.C. § 5032 requires the Attorney General to certify that one of three factors compels transfer:

> (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence....

Second, the Attorney General must also certify that, in addition to the existence of one of these three factors, "there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." Third, section 5032 requires the Government to submit the juvenile's court records (or a court clerk's certification of the unavailability or nonexistence of such records) as a jurisdictional prerequisite to a transfer proceeding:

> A juvenile shall not be transferred to adult prosecution nor shall a hearing be held under section 5037 (disposition after a finding of juvenile delinquency) until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing

that the juvenile has no prior record, or that the juvenile's record is unavailable and why it is unavailable.

If the Government fails to submit these records to the district court or make the proper certifications, the court lacks jurisdiction to engage in the ultimate inquiry regarding the suitability of transferring the juvenile. *See, e.g., United States v. John Doe*, 13 F.3d 302, 304 (9th Cir.1993).

 Once the Government meets the three jurisdictional requirements for transfer, the district court must decide whether the juvenile's transfer to adult status is "in the interest of justice." 18 U.S.C. § 5032. A juvenile, therefore, can be transferred to adult status only if both the Attorney General *and* a district court judge deem it appropriate. Section 5032 prescribes a detailed series of factors that a district court must consider; the statute requires courts to make factual findings on the following matters:

> The age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems.

An appellate court reviews a district court's transfer decision for an abuse of discretion. *United States v. Parker*, 956 F.2d 169, 171 (8th Cir.1992). The Government's proffer of "any prior juvenile court records" enables the district court to make an informed assessment of factors such as "the extent and nature of the juvenile's prior delinquency record" and "the nature of past treatment efforts and the juvenile's response to such efforts." The statute requires a complete records proffer as a jurisdictional matter in recognition of the records' crucial role in illuminating the district court's discretionary transfer decision.

Appellant Key raises three independent challenges to the district court's jurisdiction under the Act. First, he argues that the Government improperly charged him with crimes that were not cognizable under the

Act. Second, Key claims that the Government failed to satisfy the jurisdictional prerequisite of providing the district court with his complete juvenile records. *See* 18 U.S.C. § 5032. Without complete records, he argues, the district court was not entitled to assess his potential for rehabilitation in the state's juvenile justice system. Finally, he contends that a "substantial federal interest" did not support his transfer to federal court as required by § 5032. We hold that the district court properly exercised its jurisdiction over Key's prosecution.

### 1. Failure to Charge Properly

 Key's first "jurisdictional" challenge proceeds from a faulty foundation. He points out that, as a limitation on his transfer to federal court, the Act precluded the Government from charging him with conspiracy or aiding and abetting in connection with his drug violations; the Government could only charge him (as it did) with possession of heroin with intent to distribute under 21 U.S.C. § 841. Key claims on appeal that the evidence adduced at trial failed to show that he actually possessed drugs or money, and that the jury must have therefore convicted him of accountability crimes outside the purview of the Act.

This ersatz sufficiency challenge is without merit. As discussed earlier, the Government introduced a number of recorded phone conversations into evidence showing Key in possession of drugs or drug proceeds on a consistent basis; many of these calls captured Key asking other members of the conspiracy to bring him more drugs to sell on the street. Key was charged and indicted only on possession charges pursuant to 21 U.S.C. § 841; these charges were dependent on a jury finding of direct or constructive possession by Key alone. Furthermore, the Government never presented an accountability theory to the jury and, in fact, suggested that Judge Coar specifically disavow any such notion in the jury instructions. As a result, Judge Coar instructed the jury that it could only convict Key on the relevant possession counts if it could "find that he possessed or constructively possessed with the intent to distribute the controlled substances as

charged in the indictment." We have no reason to doubt that the jury followed these instructions. *See Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (noting that "[a] critical assumption underlying [the system of trial by jury] is that juries will follow the instructions given them by the trial judge").

### 2. Improper Transfer under 18 U.S.C. § 5032–Juvenile Records

■ Key argues that the district court lacked jurisdiction to conduct a transfer proceeding because the Government failed to submit all of his juvenile records to the court before the transfer hearing. Contrary to Key's suggestions, though, the Government complied with the dictates of § 5032. The Government provided the district court with a set of documents certified by the Clerk of the Circuit Court of Cook County in the motion to transfer Key to adult status in federal court. These papers showed that Key pleaded guilty to a charge of "controlled substance possession," that the circuit court adjudged him to be a delinquent, and that the court sentenced him to ten days at a juvenile detention center (with consideration of time already served). This was Key's only juvenile adjudication or conviction. Based on this information, the district court granted the Government's motion to transfer Key to adult status.

On appeal, Key does not challenge the district court's ultimate determination that his transfer was in the interest of justice. Instead, he argues that the Government's proffer of his juvenile records was inadequate and, therefore, that the district court lacked jurisdiction to grant the Government's motion. Key does not, however, point to any specific records that the Government omitted from its motion. Perhaps he refers to the records surrounding his other brushes with the law that did not result in convictions. Beginning in April 1993, officers of the Chicago Police Department arrested Key for a number of criminal offenses, including criminal trespass to a vehicle (twice), criminal trespass to state land, battery, aggravated criminal sexual assault, possession of cannabis (twice), mob action, and possession of fifteen grams of heroin. Key's presentence investigation report showed that these arrests resulted in either unknown dispositions or dismissals with leave to reinstate; none of them led to a conviction or punishment. The closest thing to another conviction in his juvenile records was a criminal charge entitled "Mob" from December 1994, which showed a bond forfeiture and the issuance of a warrant.

■ We do not regard the records of these arrests as the sort of "juvenile court records" which the Government must submit to the district court pursuant to § 5032. Key never explains how the introduction of these unadjudicated arrests would have been relevant or helpful to the district court's ruling on the Government's motion to transfer. The Government submitted certified documentation of Key's lone conviction and the resulting attempt at rehabilitation within the juvenile justice system. Appellant Key, in fact, used his short juvenile court record as an argument against his transfer to adult status; he claimed that the state's juvenile justice system did not yet have an adequate opportunity to rehabilitate him. The district court, however, deemed Key fit for trial as an adult in federal court. Admitting Key's numerous prior arrests could only have strengthened the Government's case for transfer.

The Government's action in this case does not resemble the types of omissions found in successful challenges under § 5032. At least four circuits have invalidated federal jurisdiction over juveniles based on noncompliance with this provision. In two cases, the Government failed to submit any of the juveniles' prior court records even though a subsequent investigation revealed the existence of such records. *United States v. M.I.M.*, 932 F.2d 1016, 1019 (1st Cir.1991); *United States v. Brian N.*, 900 F.2d 218, 222–23 (10th Cir. 1990). The court in a third case did not allude to the existence of any records but dismissed the prosecution because the Government failed to submit either records or a clerk's certification of their nonexistence or unavailability. *United States v. Juvenile Male*, 923 F.2d 614, 620 (8th Cir.1991). Finally, in a fourth case, the Ninth Circuit held

that the Government failed to meet the record certification requirement by submitting the defendant's records two months after the juvenile was transferred to adult status. *United States v. Doe*, 13 F.3d 302, 304 (9th Cir.1993) (dismissing the prosecution also because the tardy records were certified by an Assistant U.S. Attorney rather than by a clerk of the juvenile court). In Key's case, by contrast, the Government submitted properly-certified court records from his only conviction and sentence. There were no other court records and, thus, no certification of unavailability or nonexistence that needed to be filed. *See generally United States v. N.J.B.*, 104 F.3d 630, 636 (4th Cir.) (holding that § 5032 requires the Government to submit a juvenile's complete court records but does not require the Government to certify formally that the records are complete), *cert. denied*, — U.S. —, 117 S.Ct. 1722, 137 L.Ed.2d 844 (1997).

As stated earlier, Key does not attack the substantive accuracy of the district court's transfer decision. Indeed, it is difficult to envision a way that Key's additional arrests would have dissuaded the district court from granting the Government's motion to transfer; if anything, the additional arrests only would have served to buttress the court's conclusion that the State has "had ample opportunity to engage in rehabilitative activity and apparently has either failed to do so or failed to do so effectively...." We are careful to note, though, that a proffer of records could satisfy § 5032's standard of completeness, yet nevertheless omit data that would have significantly impacted the district court's transfer determination. In that hypothetical case, it would be possible for an appellate court to conclude that the district court abused its discretion in approving the juvenile's transfer. Jurisdiction in that case would be unimpeachable based on the records' completeness, but the ultimate decision would still be open to challenge. That case is not before us today. Thus, we hold that the Government's proffer in this case complied with the requirements of § 5032 and properly conferred jurisdiction on the district court to transfer Jamie Key to adult status.

### 3. Improper Transfer under § 5032– Substantial Federal Interest

Key finds a second jurisdictional defect in the Attorney General's certification—also pursuant to § 5032—that a "substantial federal interest" warrants the exercise of federal jurisdiction in this case. As discussed earlier, section 5032 allows a district court to transfer a juvenile to adult status only after the Attorney General certifies that "there is a substantial Federal interest in the case or the offense." This power has been delegated to the United States Attorneys, 28 C.F.R. § 0.57, and the U.S. Attorney for the Northern District of Illinois (on behalf of the Attorney General) certified that a substantial federal interest in this case counseled in favor of a federal prosecution. Key claims that his illegal conduct here does not rise to such a lofty level of national importance. The Government, on the other hand, argues that the substance of the Attorney General's certification here is unreviewable by courts and, even were it reviewable, that Key's prosecution is indeed justified by the substantial federal interest in eradicating large-scale drug trafficking operations. We agree with the Government, as well as with the majority of courts to consider this question, that we cannot substantively review the Attorney General's certification of a substantial federal interest. *See Impounded (Juvenile R.G.)*, 117 F.3d 730 (3rd Cir.1997); *United States v. Juvenile No. 1*, 118 F.3d 298 (5th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 432, 139 L.Ed.2d 332 (1997); *United States v. I.D.P.*, 102 F.3d 507 (11th Cir.1996), *cert. denied*, — U.S. —, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997). *But see United States v. Juvenile Male # 1*, 86 F.3d 1314 (4th Cir. 1996). Key's second jurisdictional challenge, therefore, must fail.

The language of the statute unambiguously vests this discretionary certification with the Attorney General. Section 5032 provides that there shall be no federal proceedings against a juvenile "unless the Attorney General, after investigation, certifies ... that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." The statute does not condition federal proceedings against a juve-

nile on the actual *existence* of a substantial federal interest; rather, the only jurisdictional requirement is that the Attorney General certify that such an interest exists. Section 5032, therefore, makes the test a subjective one—whether the Attorney General's investigation reveals to him/her a substantial federal interest—rather than an objective one. There is no congressional invitation for the courts to make a separate assessment.

It is true that courts generally are reluctant to abdicate the power of review. For this reason, the Supreme Court has "stated time and again that judicial review of executive action 'will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress.'" *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 424, 115 S.Ct. 2227, 2231, 132 L.Ed.2d 375 (1995) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). We conclude that § 5032 exhibits the requisite persuasive signs that Congress did not envision judicial oversight of the Attorney General's certification decisions. Judicial review is not usually conditioned on the existence of a specific statutory license to that effect. An absence of such a provision, however, becomes important when the same statute *does* expressly authorize judicial review of another matter. Certification by the executive branch is a threshold requirement in the transfer process, but a transfer ultimately may be granted only "if [a] court finds, after hearing, such transfer would be in the interest of justice." 18 U.S.C. § 5032. We believe that this framework evinces Congress's intent to assign different responsibilities to different actors in the transfer process. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972)).

This presumption receives further support from the different instructions given to the actors in the transfer process. Section 5032 provides no definitions or standards by which to assess a "substantial Federal interest." By contrast, the same section elaborates six detailed factors by which courts should determine whether a transfer to adult status would be "in the interest of justice." Furthermore, the section emphasizes that those factors "*shall* be considered" and that "findings with regard to each factor *shall* be made." *Id.* (emphases added). Section 5032 specifically prescribes the judicial role in determining the propriety of a transfer and directs the course of the judicial inquiry in painstaking detail. The level of specific instruction to judges in this area stands in stark contrast to the statute's silence on any standards to guide or by which to evaluate an Attorney General's certification decision.

The certification decision is no different than several other determinations committed solely to a prosecutor's discretion. Obviously, first and foremost among this genre is the ultimate decision to prosecute someone in federal court (unless motivated by unconstitutional bad faith). Other decisions of this sort include a U.S. Attorney's certification that an interlocutory appeal in certain classes of cases is undertaken to secure the use of "substantial," material evidence rather than for the purpose of delay. *See* 18 U.S.C. § 3731; *United States v. Comiskey*, 460 F.2d 1293, 1298 (7th Cir.1972). A federal prosecutor also has unreviewable power to decide that the "public interest" demands granting immunity to a witness in order to compel that witness's testimony. *See* 18 U.S.C. § 6002; *Ullmann v. United States*, 350 U.S. 422, 431–34, 76 S.Ct. 497, 502–04, 100 L.Ed. 511 (1956). The certification requirement, therefore, is just another decision in this mold and may be reviewed—like these other determinations—only for the aforementioned unconstitutional bad faith and technical compliance.

The "substantial Federal interest" standard, without any further explanation, might seem an odd phrase to courts, but it is a term of art with which executive officials are very familiar. The term is used throughout the United States Attorneys' Manual as the touchstone of all exercises of federal prosecutorial discretion. *See Juvenile No. 1*, 118

F.3d at 305–06. For instance, the Manual advises U.S. Attorneys to abstain from initiating proceedings if "[n]o substantial federal interest would be served by prosecution." U.S. DEPT. OF JUSTICE, U.S. ATTORNEYS' MANUAL § 9–27.220. This is a decision federal prosecutors must make in every single case. The Manual goes on to discuss some of the factors that should govern this determination:

> In determining whether prosecution should be declined because no substantial federal interest would be served by prosecution, the attorney for the government should weigh all relevant considerations, including:
>
> (1) Federal law enforcement priorities;
>
> (2) The nature and seriousness of the offense;
>
> (3) The deterrent effect of prosecution;
>
> (4) The person's culpability in connection with the offense;
>
> (5) The person's history with respect to criminal activity;
>
> (6) The person's willingness to cooperate in the investigation and prosecution of others; and
>
> (7) The probable sentence or other consequences if the person is convicted.

*Id.* § 9–27.230. In a passage relevant to a juvenile's challenge to the Attorney General's certification under § 5032, the Manual advises against commencing a federal prosecution based on the same acts involved in a prior state proceeding unless the matter involves a "substantial federal interest." *Id.* § 9–2.142.

The Attorney General's certification, thus, is essentially a perfunctory corollary to the decision to prosecute itself. The Supreme Court has spoken on the reasons why these type of decisions should be insulated from judicial review:

> [T]he decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plans are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985). This decision is administrative in nature, made after a studied assessment of the Government's policy visions and priorities, as well as practical considerations like budgetary constraints, the effectiveness of prior enforcement efforts in a particular area, and the strategic advantages and disadvantages of proceeding in federal court. In short, it is precisely the type of task assigned to a political branch rather than to our government's neutral arbiters. Courts are inherently reactive bodies and an attempt to second-guess the executive branch's prosecutorial discretion in this regard would expand the bounds of our delegated authority and commit us to an inappropriate role in the criminal justice system.

As a final matter, we note that our conclusion takes into account the Supreme Court's 1995 decision in *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). In that case, the Court considered a provision of the Westfall Act that empowers the Attorney General to certify that a federal employee sued for negligence "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). Once the Attorney General makes this certification, the United States Government takes the place of the employee as the defendant and the governing law becomes the Federal Torts Claims Act (FTCA), 28 U.S.C. § 2671. The plaintiffs in *Lamagno* urged the district court to review the Attorney General's certification in their case because the FTCA would have required dismissal of their claims. The Court held that judges could review the substantive accuracy of the Attorney General's certification for two main reasons: (1) the Attorney General had an "overwhelming" incentive to make this certification in order to avoid liability, *Lamagno*, 515 U.S. at 427, 115 S.Ct. at 2233, and (2) courts traditionally have reviewed a government official's determination of factual matters that are dispositive of court controversies, *id.* at 429–30, 115 S.Ct. at 2233–34.

Those two concerns are not implicated in § 5032. The statute does not deprive any injured parties of a remedy at tort—one of the factors fueling the Court's decision in *Lamagno*. Furthermore, there is no hint that the Attorney General would (or could) have a conflict of interest in deciding whether a prosecution was justified by a substantial federal interest. The decision to prosecute results in expenditures and diversion of resources from other tasks rather than an immunity that safeguards governmental funds. Finally, a certification of the existence of a substantial federal interest is not outcome-determinative in the same way that the certification can be in the FTCA context. Under § 5032, the district court still makes the ultimate determination of whether a transfer to adult status is appropriate and does not merely rubber-stamp the Attorney General's decision on the matter.

We join the Third, Fifth, and Eleventh Circuits in holding that courts cannot review the substantive basis of the Attorney General's certification of a "substantial Federal interest" under 18 U.S.C. § 5032. Defendants can challenge technical aspects of the Government's compliance with the certification requirement (e.g., whether the certifying party was a proper agent of the Attorney General, whether the certifying party actually made the unreviewable statement that a substantial federal interest existed, whether the certification was filed in a timely manner, etc.). Defendants also remain free to raise constitutional challenges to certifications that are made in bad faith and/or that constitute selective prosecution. *See Wayte*, 470 U.S. at 608, 105 S.Ct. at 1531. Appellant Key, however, does not raise a challenge that is cognizable in the federal courts.

## III. CONCLUSION

For the foregoing reasons, we affirm all of the appellants' convictions and sentences.