In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3676

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WILLIAM SCOTT,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 312--Suzanne B. Conlon, Judge.

Argued April 5, 2001--Decided May 11, 2001

Before BAUER, RIPPLE, and EVANS, Circuit Judges.

EVANS, Circuit Judge.  Despite receiving rather favorable treatment under the federal sentencing guidelines, William Scott appeals his sentence, arguing that his case--which involves phony "access devices"--should have been resolved even more favorably under a guideline regarding "attempts" to commit a crime, a guideline the district judge declined to employ.

In November of 1999, Scott was arrested by Chicago police officers while attempting to make a $1,500 purchase with a counterfeit credit card bearing the name of Kevin Minter. Searches of his car and person recovered two more counterfeit credit cards, and a check disclosed they were recently used to incur $8,500 in fraudulent charges. Unfortunately, this encounter with the police didn't teach Scott a lesson: He was released without being formally charged, only to return to hot water a few months later.

In February 2000, Scott was stopped by DEA agents at Chicago Midway Airport as he was about to board a flight to California. A search uncovered a computerized list of 414 cloned telephone numbers, with corresponding electronic serial numbers and handwritten directions

explaining how to clone cellular phones. Scott also possessed a credit card "wedge" that can be used to read account information from legitimate credit cards. Scott and his traveling companion at Midway were also holding some $25,000 in cash when they were stopped.

As a follow-up to the Midway stop, Scott turned over to postal inspectors some 60 cards and equipment he used to make them into phony, but usable, credit cards. Scott also acknowledged that at one time he possessed an additional 140 credit cards that, in many instances, he manufactured into counterfeit credit cards. He explained that he purchased the 200 cards from the person who created the phony "Kevin Minter" cards he used to make fraudulent purchases in November of 1999.

Scott was charged in a 2-count indictment with knowingly possessing 15 or more counterfeit access devices with intent to defraud in violation of 18 U.S.C. sec.1029. The access devices were the 414 cloned telephone numbers he possessed at Midway Airport and the 60 counterfeit credit cards he turned over after his Midway arrest. Scott pled guilty, without a plea agreement, to both counts of the indictment, admitting that he possessed the cloned telephone numbers so he could "basically use them for telephone calls without paying for the calls." He also admitted possessing the 60 counterfeit credit cards "to obtain some things of value [he] wouldn't have to pay for if [he] used those credit cards."

At his sentencing hearing, Scott made several arguments in an attempt to reduce the amount of loss attributable to him for purposes of calculating his positioning on the sentencing guideline grid. His final argument, the one he makes on this appeal, is that guideline sec.2X1.1, which concerns "attempts" to commit a crime, governs his case.

The district court rejected Scott's argument, proceeding instead under the fraud and deceit guideline, sec.2F1.1. As we shall see, the court made the right choice.

Guideline sec.2F1.1, which covers "Fraud and Deceit," carries a base offense level

of 6. Scott then received a 6-level increase in his base offense level pursuant to sec.2F1.1 (b)(1)(G) for a loss attributable to him to the tune of $71,400. That figure was reached by adding the actual charges--$8,500--made by Scott on the cards seized from him by Chicago police department officers in November; the charge Scott was trying to make on the phony card when he was arrested--approximately $1,500; losses attributed to the 414 cloned cellular telephone numbers at $100 per number--$41,400; and losses attributed to the 200 counterfeit cards Scott said he had at $100 per card--$20,000. Scott also received a 2-level increase in the base offense level pursuant to guideline sec.2F1.1(b)(2) for more than minimal planning, but that was offset by a 2-point reduction for acceptance of responsibility. Scott's adjusted base offense level of 12, with a criminal history category of I, put him in a sentencing range of 10 to16 months imprisonment. The district court, however, granted the government's motion for an upward departure to criminal history category II to better reflect the true nature of Scott's criminal history. But oddly, that inflicted no pain as Scott's sentencing range only moved to 12 to 18 months imprisonment, and he received a 16-month sentence, a term which could have been imposed without an upward departure.

As Scott sees it, his sentencing range, even after the upward departure, should have only been 6 to 12 months based on an adjusted offense level of 9 rather than 12. He saves himself 3 levels by using sec.2X1.1 as his starting point instead of sec.2F1.1. His basis for using sec.2X1.1 is simple:  he caused an actual loss of $8,500 and was on the verge of completing an additional $1,500 loss in November of 1999. Everything else was only "intended losses" as he had not completed all acts necessary to carry out the frauds, i.e., he had not yet cloned any cell phones and the other credit cards were not used. Thus, he argues, he only partially completed any additional offenses, and he's entitled to lop 3 points off his guideline grid under sec.2X1.1 because what he did was no more than an "attempt." We reject this argument.

In this day and age, when most people pay for things of value with plastic and cellular telephones are everywhere, the fraudulent use of these "access devices" results in staggering losses in the economy. See Theresa L. Kruk, Annotation, What Constitutes Violations of 18 U.S.C.A. sec.1029, Prohibiting Fraud or Related Activity in Connection With Credit Card or Other Credit Access Devices, 115 A.L.R. Fed. 213 (1993). A key to the effectiveness of sec.1029 in combating credit fraud is a broad, open-ended definition of an "access device" so as to accommodate future technological developments. Scott's credit cards and his cloned telephone numbers fit nicely under the definition of "access devices," and no one even argues that they don't. But the argument that a full crime is not completed until an access device is actually used, and that everything short of actual use is no more than an "attempt" triggering sec.2X1.1 of the guidelines, must fail. Scott's mere possession of the access devices completed the crime: Nothing more was necessary.

The guidelines merely assign a monetary value to each illegal device, with $100 being the minimum. This amount has been raised to $500 per device, but Scott got nailed when the 1998 edition of the guidelines, with its $100 limit, was in effect. Had the new guideline been in effect, his chargeable loss would have been more than $200,000 and his sentencing range would have been 18 to 24 months, insuring a greater sentence than the 16 months he received.

By employing the $100 per device kicker, Scott actually caught a break. His "intended loss" could have been much higher. Given these facts, it would have been quite reasonable to peg the loss at over $800,000 for he charged $8,500 using two counterfeit credit cards that were found in his possession when he was arrested in November 1999. Thus, an intended loss of $4,250 per card could be established for the 200 blank credit cards he possessed. See United States v. Chernoff, 23 F.3d 411 (7th Cir. 1994) (where 750 accounts had been accessed, and actual loss as to one-third of the victims was $135,000, total intended loss equals $405,000); see also guideline sec.2F1.1, application note 9 ("For the

purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.").

Scott places great emphasis on application note 10 to sec.2F1.1, which reads, "In the case of a partially completed offense . . . the offense level is to be determined in accordance with the provisions of sec.2X1.1." Notably, however, no similar provision exists when discussing the $100 loss figure to be applied to access devices under application note 4 to sec.2B1.1. Nowhere in application note 4 does it state that the offense level is to be determined in accordance with the provisions of sec.2X1.1 when the loss is valued at $100. The absence of such language is telling.

On top of all this, we recently precluded the type of argument Scott is now making in United States v. Strozier, 981 F.2d 281 (7th Cir. 1992). There, a defendant deposited $405,000 worth of bad checks into his bank account. He was able to withdraw only $36,000 from the account before his scheme was revealed. Nevertheless, the loss attributable to him was $405,000. Id. at 282-83. On appeal, he argued that he was guilty of only a partially completed offense on the basis of the same application note that Scott relies on. Id. at 285. We disagreed:

Initially, we note that the defendant's plea of guilty to the substantive, completed offense of fraud is powerful evidence that he merited no reduction for the allegedly uncompleted nature of his scheme.

. . . .

. . . In our view, the defendant did not "partially" complete his offense, nor was the fraud to which he pled guilty part of a "larger, attempted fraud." The defendant completed his [fraud] when he set up the two fraudulent accounts; what he did not get around to completing was inflicting on Fidelity all the loss his actions clearly indicate he planned.

So, for all these reasons, we must reject Scott's appeal. As to one minor

matter, however, he comes out on top. The district court ordered restitution totaling $8,921.80 (we assume interest of some sort was added to the $8,500 figure) based on actual use of the two cards in November 1999. Although this was surely "relevant conduct," it was not "charged conduct," so without covering the topic in a plea agreement (recall, Scott pled guilty without an agreement), restitution under the Mandatory Victim Restitution Act cannot be awarded. See United States v. Menza, 137 F.3d 533 (7th Cir. 1998).

Accordingly, the restitution order is stricken, but in all other respects the judgment of the district court is AFFIRMED.