In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-2559

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHOU Z. MEI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 128-1—**Ronald A. Guzman**, *Judge.*

ARGUED SEPTEMBER 18, 2002—DECIDED JANUARY 9, 2003

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Shou Mei pleaded guilty to six felonies stemming from his role in a conspiracy to commit fraud using counterfeit credit cards, and now challenges the calculation of the financial loss used to determine his sentences. Although he conceded stealing nearly $600,000, the district court determined that Mei intended to cause a loss of more than $1.9 million. Most of the credit cards involved in the conspiracy were never recovered, so the district court estimated Mei's intended loss by multiplying the average maximum credit limit of the recovered cards with known credit limits by the total number of cards used during the conspiracy. Mei contends that the method used by the district court to calculate

the loss was not reasonably reliable, and that the actual financial losses he caused more reasonably reflect the harm. We affirm.

The story begins in early 1999, just after Mei was released from federal custody in Ohio after serving time for attempted credit card fraud (his second credit card fraud-related federal conviction, it turns out). Under pressure to make good on his gambling debts, Mei returned to Chicago to raise cash. His fund-raising scheme involved having accomplices place "skimmers," portable data storage devices that capture information from the magnetic strip on the back of a credit card, in Chinese restaurants, where corrupt cashiers and servers would swipe the cards of unsuspecting diners. Mei downloaded the information from the skimmers onto a computer that he used to produce counterfeit credit cards and matching identification. On May 17, 1999, Mei gave four cards bearing the name "Xin Chan" to an accomplice, Lau Ming, who tried to use the cards at a Marshall Field's department store in Calumet City, Illinois. The cards did not work and were confiscated. Mei gave four more "Xin Chan" cards to another accomplice (and a future government informant) known only as "Person A," who attempted the same fraud at the same store. Again the cards did not work and were confiscated. Mei continued to produce cards, however. Ming, along with another future government informant known as "Person D," successfully purchased $231 in cigarettes from a Wal-Mart in Bloomingdale, Illinois. Ming and Person D then attempted to buy a $400 camera at a nearby K-Mart, but the cards were rejected and confiscated. Later, Ming and Person D obtained over $800 in cigarettes from a Highland, Indiana, Cigarette Discount Outlet using cards bearing the name "Jin Lang." Between April and June 1999, Ming eventually charged over $50,000 with cards supplied by Mei.

On June 15, 1999, Mei hosted a meeting of Ming, Person D, and accomplices Chris Huang, Zhou Li, and Nom Tin Chan. There, Mei introduced a profit-sharing arrangement by which he would distribute to each of them counterfeit credit cards and matching identification, and in turn each would use the cards to obtain cash or goods that Mei could trade for cash on the illegal market. Any person able to obtain $12,000 or more would share in the profits of the scheme. In addition, Mei urged the crew to place his skimmers in restaurants, and offered to pay $20 for each stolen credit card number.

At the same time, Mei was trafficking counterfeit cards to persons operating in Ohio. One of his Ohio contacts, a government informant known as "Person C," bought 30 cards and matching identification from Mei in Chicago, returned to Ohio, and made approximately $12,000 in bogus purchases. Mei then delivered 30 more cards to Person C in Ohio, who charged another $12,000. On another occasion, Person C and another informant known as "Person B" met Mei outside of a McDonald's restaurant in Highland, Indiana, where they gave Mei $16,300 for 20 cards and matching identification. Through the end of 1999, Mei sold Persons B and C approximately 130 cards along with several matching driver's licenses and at least two skimmers for about $40,000. And by November 1999, Person B had obtained over $33,000 with the cards, in part by taking out cash advances at Indiana riverboat casinos.

The scheme continued into the following year. In early February, Mei arranged to deliver 20 cards and matching identification to Person A. Then, on February 19, 2000, Mei and Chris Huang ordered $30,000 in computer equipment from Urban Computer in Chicago, telling the salesperson that they were starting an internet business. They arranged to pay for and pick up the equipment the next day. Mei, Ming, Huang, Zhou Li, Nom Tin Chan, and Person A met at Mei's home the next morning. Mei distributed 20 cards

each to Ming, Li, Chan, and Person A, and at noon they boarded vans and proceeded to Urban Computer. Mei remained in one of the vans, but directed Huang to negotiate the remainder of the sale. Although many of the 80 cards did not work, Ming, Li, Chan, and Person A produced card after card until they found some that did work. Eventually, Ming charged $11,550, Li charged $8,550, and Person A charged $10,050. As they loaded up the vans and prepared to do additional "shopping," federal agents, tipped off by Person A, intervened and arrested everyone. Mei was indicted on charges of conspiracy to commit credit card fraud, trafficking in one or more credit cards, possessing fifteen or more counterfeit credit cards, plus three counts of aiding and abetting the use of counterfeit credit cards. *See* 18 U.S.C. §§ 2, 1029(a)(1), (a)(3), (b)(1). Huang, Ming, Li, and Chan were named in the same indictment as co-conspirators. Persons B and C later told the government that the object of the scheme was simply to steal as much as possible by using each card up to its credit limit or until it no longer functioned.

Mei eventually pleaded guilty to the indictment without a plea agreement with the government. Sentences for fraud crimes are based in part on the amount of financial loss, and at Mei's sentencing the government urged the district court to set the loss at $1,918,172.27, which it argued was a reasonable estimate of the sum of the maximum credit limits of all of the counterfeit credit cards used during the conspiracy. The government had to estimate the total amount of credit placed at risk in this case because most of the cards involved in the conspiracy were never recovered, and also because some of the issuing financial institutions did not cooperate with investigators. To determine the average maximum credit limits of all of the cards, the government first separated the cards with known credit limits into three categories based on when or where the cards were used or seized. The first category

included all cards with known credit limits used or seized in May or June 1999; the second included cards with known credit limits seized in Ohio; and the third included those with known credit limits used or seized on February 20, 2000. The government excluded from its calculation two cards with unusually high credit limits of over $157,000 and $75,000. The government then multiplied the average maximum credit limits of the cards with known limits in each category—$12,066.67, $6,942.86, and $12,864.64, respectively—by the total number of cards known to have been used for each category—25, 160, and 34, respectively—and added the results for a total of $1,918,172.27. This sum increased Mei's base offense level by 12 under U.S.S.G. § 2F1.1(b)(1)(M).*

Pointing out that the estimate was based on a sampling of just 16 percent of the cards employed during the conspiracy, Mei argued that the government's loss estimate was too speculative. Instead, he urged the court to adopt one of what he asserted were two more reasonable methods of calculating his loss. First, Mei suggested multiplying the average actual loss to each victim ($2,722.61) by the number of cards placed at risk (219). This calculation resulted in an estimated loss of $596,251.59. Alternatively, he suggested multiplying the average loss for the cards in each category by the number of cards seized or used in each category, which resulted in a slightly lower loss estimate of $555,191.79. Both alternatives would have increased Mei's base offense level by ten under U.S.S.G. § 2F1.1(b)(1)(K). The district court rejected Mei's

* Mei was sentenced under the guidelines manual effective November 1, 1998. On November 1, 2001, the Sentencing Commission deleted § 2F1.1 and consolidated its provisions as amended with § 2B1.1. *See* U.S.S.G. App. C, amendment 617. All references in this opinion to guidelines sections are to the 1998 version of the manual.

suggestions, however, finding that the government's calculation more accurately reflected the loss because Mei "intended to gouge his victims for every penny he could with every card that he had in every way that he knew." The addition of the 12-level increase to his offense level set Mei's guideline range at 57-71 months. The district court imposed the maximum term allowed in the range.

On appeal, Mei argues that the district court's loss calculation was unreasonable, and that either of his two suggested alternative methodologies provide a more accurate and reasonable estimate of the loss. He contends that neither the sentencing guidelines nor the cases interpreting them sanction the averaging methodology applied by the district court; that even if it were proper to employ an averaging methodology in this case, the methodology was too imprecise to render a reasonable estimate of the loss; and that even if the methodology employed by the district court rendered a reasonable estimate of the loss, the factual underpinning of its application—the court's finding that Mei intended to use the cards right up to their credit limits—was clearly erroneous. Mei's contentions, if correct, would limit his time in prison to 57 months. The district court's determination of the amount of loss is a question of fact we review for clear error, although the application of the sentencing guidelines is a legal question we review *de novo*. *United States v. Higgins*, 270 F.3d 1070, 1074 (7th Cir. 2002).

The base offense level for fraud and deceit crimes is subject to graduated increases based on the amount of financial loss attributable to the defendant, if the loss exceeds $2,000. U.S.S.G. § 2F1.1(b)(1). The commentary following the guideline, which is an authoritative interpretive aid explaining how the guideline should be applied, U.S.S.G. § 1B1.7; *United States v. DeCicco*, 899 F.2d 1531, 1537 (7th Cir. 1990), instructs that the amount of loss considered is the defendant's intended, rather than actual,

loss, if an intended loss can be determined, and if the intended loss exceeds the amount of actual loss. U.S.S.G. § 2F1.1, comment. (n.8). In calculating an intended loss, the sentencing court is required to make only a reasonable estimate of the loss given the available information. *Id.*, comment. (n.9).

Intended loss, if it can be determined, is applied in fraud cases because the actual amount of money or property obtained generally understates the true financial loss. *See id.*; *United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002). This is so because the purpose of fraud statutes such as the statute Mei violated, 18 U.S.C. § 1029, is to punish the scheme, not simply the unlawful taking of money or property. *See United States v. Coffman*, 94 F.3d 330, 333 (7th Cir. 1996). Indeed, the fraud would have been complete even if Mei had not used the cards. *See United States v. Scott*, 250 F.3d 550, 552 (7th Cir. 2001). Thus, in determining an intended loss courts focus on the amount that the scheme placed at risk, not the amount of money or property stolen. *Id.*; *United States v. Bonanno*, 146 F.3d 502, 509-10 (7th Cir. 1998); *United States v. Strozier*, 981 F.2d 281, 284 (7th Cir. 1992); *see also United States v. Sowels*, 998 F.2d 249, 251 (5th Cir. 1993) (financial loss caused by credit card fraud is the combined credit limits of the stolen cards).

Both of Mei's suggested methodologies estimate the actual losses he inflicted, so either might stand in as an acceptable alternative if his intended loss could not be reasonably estimated. We believe, however, that there was sufficient information for the district court to determine the intended loss, and that the methodology it employed to do so was appropriate. Despite Mei's contention otherwise, we, as well as other courts and the Sentencing Commission, have approved averaging as a reasonable method of calculating intended loss in fraud cases. *See Scott*, 250 F.3d at 552; *United States v. Egemonye*,

62 F.3d 425, 428-29 (1st Cir. 1995); *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997); *United States v. Koenig*, 952 F.2d 267, 271 (9th Cir. 1991); U.S.S.G. § 2F1.1, comment. (n.9); *see also United States v. Jarrett*, 133 F.3d 519, 530-31 (7th Cir. 1998) (approving averaging to calculate reasonable estimate of drug quantity in narcotics trafficking). In a case such as this, where the total number of counterfeit cards is known but the total amount of credit placed at risk is not, multiplying the average credit limits of cards with known limits by the total number of cards involved in the conspiracy renders a reasonable estimate of the loss.

Mei contends, however, that the representative sampling of cards with known credit limits was far too small to render a reliable estimate of the average maximum credit limits in each category, so that the district court lacked sufficient information to determine an intended loss. The respective averages of the three groups of cards were extrapolated using roughly 12, 8.75, and 82 percent of the cards. Although we have sustained a loss determination based on a much smaller sampling, *see Scott*, 250 F.3d at 552 (2 of 200 cards), what matters is that the representative sample yield a reasonably reliable figure under the circumstances, and that is the case here. The average for the cards used or seized on February 20, 2000, was $12,864.64, a figure extrapolated from 82% of the cards. Yet the average determined for the cards used or seized in May and June 1999 was just slightly under this number, $12,066.67, despite being based on a sample of only 12% of the cards. And the average extrapolated from the cards seized in Ohio, which was based on only 14 of 160 or 8.75% of the cards, was significantly lower, $6,942.86. Thus, the categories containing the least amount of information rendered averages more favorable to Mei than the category with the best information. Considering also that two cards with unusually

high credit limits were eliminated from the mix, we believe that the district court's estimate of the averages for each category was sufficiently reliable, if not conservative.

Of course, these numbers hold water only if, as the district court found, Mei "intended to gouge his victims for every penny he could with every card that he had in every way that he knew." Mei argues that this finding is contrary to the evidence before the court at sentencing. He points out that only one card was used up to its maximum credit limit, and that only two other cards were used close to their maximum credit limits. He further argues that he could not have intended to use each card up to its limit because it was not possible for him to do so. But Mei's failure to exploit the cards to their fullest potential is not dispositive—it is irrelevant that the full extent of the risk did not materialize. *Higgins*, 270 F.3d at 1075; *Bonanno*, 146 F.3d at 509-10; *Strozier*, 981 F.2d at 284; *United States v. Studevent*, 116 F.3d 1559, 1561-62 (D.C. Cir. 1997). The amount of money or property Mei was able to obtain from the counterfeit cards was limited not by his own restraint, but by facts beyond his control. Mei did not know the limits of each stolen credit card number when he obtained it—for all he knew, a skimmed card could have a credit limit of $150 or $150,000 (and one did in fact have a limit of more than $150,000, although it was excluded from the calculation). Some cards when stolen may already have been at or near their limit, so that they did not work when Mei attempted to use them. Or, some of the cards did not work because their rightful owners were delinquent in paying a bill or had previously reported the number stolen. Or, Mei was arrested before he could more fully exploit the scheme. That he was thwarted from extracting the full potential of the cards by events beyond his control does not speak to whether he intended to do less or was less culpable. *See Coffman*, 94 F.3d at 333.

Here, there was plenty of evidence for the district court to conclude that Mei intended to use each card up to its limit if possible: the profit-sharing arrangement Mei introduced, whereby his accomplices would share in the profits of the scheme only after they had charged at least $12,000, suggested to and encouraged his accomplices to charge as much as possible; Persons B and C indicated that they purchased cards from Mei with the understanding that they were to use the cards to their maximum limits; and there is nothing in the record or the briefs suggesting that Mei or his accomplices set a limit on how much they could use an individual card.

Because we see no error in the calculation of Mei's intended loss, we AFFIRM the judgment of the district court.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*