# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-2413

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARNELL MURRY,

*Defendant-Appellant.*

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 CR 1056—**Suzanne B. Conlon**, *Judge.*

ARGUED APRIL 6, 2004—DECIDED JANUARY 3, 2005

Before RIPPLE, KANNE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury found Darnell Murry
guilty of one count of transporting fraudulently obtained
merchandise across state lines in violation of 18 U.S.C.
§§ 2314 and 2, and one count of obtaining goods valued at
over $1000 through the unauthorized use of an access de-
vice in violation of 18 U.S.C. § 1029(a). On appeal, Murry
challenges both his conviction and his sentence, claiming
the district court erred in several evidentiary rulings and in
instructing the jury on the use of summary charts admitted
into evidence. He complains the court also erred in setting

the amount of restitution he is required to pay as part of his sentence. We affirm the conviction but vacate and remand the sentence so that the district court may adjust the restitution order.

## I.

Murry devised a simple scheme to lift large amounts of merchandise from stores without paying for it so that he could resell it on the street. In the beginning of this ill-conceived venture, Murry simply added himself as an authorized user on the store credit card accounts of unsuspecting shoppers. He then purchased goods in person at the stores or placed telephone orders for merchandise and sent his cousin, Horatio Jones, to pick up the items with a rented truck. Co-defendant Kwonnie Stanciel also assisted Murry by finding buyers for the fraudulently obtained merchandise. Evidence at the trial showed that Murry used twenty-five credit card account numbers belonging to twenty-three different victims to complete or attempt to complete purchases totaling more than $250,000 at Home Depot, Sam's Club and Wal-Mart stores in Illinois, Michigan, Wisconsin and Indiana. All of these stores had credit programs run by GE Capital. The purchases were made between March 28, 2002 and October 31, 2002.

Jones was eventually arrested trying to pick up a load of hardwood flooring that Murry had ordered using one of the fraudulent accounts. Jones agreed to cooperate with the government in an investigation of Murry's fraudulent purchases. Jones subsequently recorded phone calls with Murry in which Murry asked Jones to pick up more hardwood flooring from Home Depot stores in Michigan and Indiana. On October 31, 2002, the scheme came to an end. Jones had recorded calls in which Murry asked him to pick up $12,000 worth of hardwood flooring from a Home Depot store in Indiana. Murry had ordered the flooring by phone, again

using one of the accounts to which he had fraudulently added his name as an authorized user. Murry and Stanciel drove a car to the Indiana Home Depot with Jones following in a truck. Unbeknownst to Murry, their small convoy was accompanied by a number of federal agents witnessing the transaction. After the merchandise pick-up, Murry directed Jones to an alley in Chicago to deliver the goods. Murry was then arrested and charged as we have described above.

All of the purchases that were at issue at trial were summarized in charts admitted as Exhibits 222 and 223.[1] The charts were prepared by Kellie Meador, an employee of GE Capital, and were based on the business records of GE Capital. Exhibit 222 displayed the purchases made at Home Depot stores, and Exhibit 223 illustrated the purchases at Sam's Club stores. Although the underlying business records of GE Capital were not introduced into evidence at trial, for every transaction listed on the summary charts a corresponding receipt or order form was introduced into evidence from the records of the stores themselves. The Home Depot summary chart consisted of eleven columns, titled "Account #", "Name", "Auth Name", "Auth User Added", "Account Open Date", "Write Off/Adj Amt", "Date of Transaction", "Transaction Amount", "Store #", "Called By", and "Call Date". The Sam's Club summary chart consisted of ten columns, identical to those included on the Home Depot chart minus the "Auth User Added" column. For five of the Home Depot accounts, the authorized user listed is Darnel Murry. Other authorized users included David Cole and Thomas Toomey, aliases linked to Murry by other evidence submitted at trial. On the Sam's Club accounts, the authorized users added to the accounts were either Darnel Murry or Darael Murry, another alias linked

---

[1] The charged conduct included both completed and attempted transactions. For brevity, we will simply refer to the attempted and completed transactions together as "purchases."

to the defendant. The "Called By" column listed phone numbers from which GE Capital received inquiries about the account in question. The six different phone numbers used to access account information were all linked to Murry through cell phones or through his home address through other evidence at trial. After two of the primary account holders testified at trial that they did not know Murry, never added him to their credit card accounts as an authorized user, never made the purchases in question and did not authorize Murry to make any purchases for them, Murry stipulated that the rest of the account holders would testify in the same manner. This stipulation established that each and every purchase was unauthorized.

The summary charts were not the only evidence against Murry. A Home Depot loss prevention employee testified that he observed Murry purchase several expensive tools, including multiples of the same tool, from the store's "tool corral," an area that contains high end, frequently stolen merchandise. The employee videotaped the purchase, which Murry made with one of the fraudulently obtained credit cards. The receipt for this purchase was also admitted as evidence, showing that Murry had used one of the fraudulently obtained credit cards. The purchase totaled approximately $1400. The prosecution entered into evidence another videotape of Murry making a different purchase using that same credit card, and again the receipt was admitted into evidence. This receipt displayed Murry's driver's license number, which was written down by a store clerk at the time of the purchase.

One of Murry's cohorts in this crime spree testified against him at trial. His cousin, Horatio Jones, testified that he picked up merchandise for Murry on multiple occasions from Home Depot stores in Illinois, Indiana, Wisconsin and Michigan. Jones' testimony was corroborated by the recorded phone calls we mentioned above and by order forms for the purchases, each bearing Jones' signature, an account num-

ber of one of the victims, and a phone number linked to Murry from which the order was placed. For these transactions alone, the purchases totaled more than $80,000.

Additional evidence was provided by a Sam's Club employee who testified that Murry added himself as an authorized user to one of the victim's credit card accounts by filling out a form at the store. The employee photocopied Murry's driver's license as part of the transaction, and both the application form and the driver's license photocopy were admitted as evidence. Another Sam's Club employee, a supervisor at the membership desk, testified that she saw Murry attempt to make a purchase using a membership card that bore his picture and the name of one of the victims. When she told Murry that she needed a manager's approval to complete the transaction, Murry left the store and left the membership card behind. The card bearing Murry's likeness and the name of the account holder/victim was admitted at trial. Seven other photographs of Murry taken by Sam's Club employees when he added himself to other victim accounts were admitted into evidence.

Finally, the government submitted fingerprint evidence against Murry. One document containing Murry's fingerprints was a Home Depot order form that Murry gave to Jones after placing an order and asking Jones to pick it up for him. Murry's cell phone number also appeared on the order form. A second document containing Murry's prints was a Sam's Club receipt for items totaling $1911.26, charged to one of the accounts on which Murry stipulated he was not an authorized user. The government produced a third document containing Murry's prints, the application form that Murry filled out when adding himself as an authorized user to one of the accounts. The application contained his name, and the government also produced a photocopy of Murry's driver's license taken when he filed the application. The last document containing Murry's fingerprints was another receipt documenting an unauthorized

purchase. Two of these documents were damaged or destroyed by the process used to lift the fingerprints, and so copies of the originals were introduced into evidence at trial. All in all, more than 220 exhibits were introduced at trial, including receipts for fraudulent credit card purchases from Home Depot, Sam's Club and Wal-Mart totaling more than $240,000, order forms for Home Depot telephone orders, Sam's Club membership forms, documents reflecting the pickup of Sam's Club membership cards, a Sam's Club card in a victim's name containing Murry's photograph, photographic negatives and prints of pictures taken when Murry added himself as an authorized user to certain accounts, videotapes of Murry making purchases, audiotapes of phone calls, telephone records, receipts, and fingerprint evidence. The links between Murry and the fraudulent purchases were numerous. The receipts submitted into evidence were all signed either "Darnel Murry" or "Dareal Murry." Some of the receipts contained Murry's driver's license or state identification numbers. The photographs taken when Murry added himself to certain of the accounts were labeled with the name "Darael Murry." Murry's name (with either Dareal or Darnel as the first name), address, phone number, driver's license number and his state identification number were listed on documents identifying Murry as a secondary user of credit cards belonging to others. Murry's driver's license was photocopied multiple times by Sam's Club employees when he picked up secondary user cards at Sam's Club stores. The telephone numbers appearing on documents identifying Murry as a secondary user of certain credit cards and on Home Depot order forms as well as the phone numbers used to access the credit card accounts were all telephone lines and/or cell phones where Murry or someone at his residence was the main subscriber.

All of this evidence was presented in the course of a two-day trial. On the morning of the third day, the jury convened at 9 a.m. to begin its deliberations. As we have

described above, the evidence left little to the imagination, and the verdict was announced an hour and a half later. The court sentenced Murry to 125 months' imprisonment to be followed by a three-year term of supervised release. The court ordered restitution in the amount of $647,045.22 payable to GE Capital. This amount was based on the total loss shown at trial as well as additional documentation provided by GE Capital in the sentencing phase. Murry appeals.

## II.

On appeal, Murry contends that the district court erred in instructing the jury that summary Exhibits 222 and 223 accurately reflected the underlying records, and that this error plainly prejudiced the outcome of the trial. Murry also maintains that the trial court abused its discretion by admitting Exhibits 222 and 223 because there was no showing on the record that the government had made the underlying documents available to the defendant for review, and because the foundation for these exhibits was inadequate. According to Murry, the admission of these exhibits prejudiced his substantive rights and he would not have been convicted without this evidence. Murry also argues that the court plainly erred when it allowed the government's fingerprint analyst to testify to the contents of Home Depot and Sam's Club business records. Murry also challenges the admission of two of the fingerprint documents on the grounds that they were not properly authenticated and because the government failed to present the chain of custody from Sam's Club to the government's fingerprint expert. Finally, Murry challenges the amount of restitution ordered, arguing that the court erred in ordering restitution in part for uncharged conduct.

**A.**

At trial, when the parties addressed the jury instructions with the court, the district judge asked twice whether counsel objected to any of the jury instructions. Murry's counsel replied, "Judge, I don't object to anything." Tr. at 409. He then asked for a single change to an unrelated instruction and the court modified the instruction per his request. The government then requested a number of changes to the instructions and after that colloquy, the court asked a second time, "Are you in agreement with all of those?" Murry's counsel replied, "I do agree. That's fine. Yes, your Honor." Tr. at 414. The government contends that this express agreement with the jury instructions constitutes waiver of any issue related to the jury instructions. Waiver precludes appellate review, the government argues. Murry counters that he did not intentionally relinquish any rights and therefore, at worst, he forfeited the issue and we may review it for plain error.

Waiver occurs when a defendant intentionally relinquishes a known right. *United States v. Staples*, 202 F.3d 992, 995 (7th Cir. 2000). Waiver extinguishes the error and precludes appellate review. *United States v. Cooper*, 243 F.3d 411, 415 (7th Cir.), *cert. denied*, 534 U.S. 825 (2001); *Staples*, 202 F.3d at 995. Forfeiture occurs when a defendant negligently fails to assert his or her rights in a timely fashion. *Cooper*, 243 F.3d at 415-16 (forfeiture is an accidental or negligent omission, or an apparently inadvertent failure to assert a right in a timely fashion); *Staples*, 202 F.3d at 995. In the case of forfeiture, we may review a ruling for plain error. *Cooper*, 234 F.3d at 415; *Staples*, 202 F.3d at 995. In this case, Murry waived his objection to the jury instruction at issue. The trial court asked Murry's counsel twice whether he had any objections to the instructions and twice he replied definitively that he did not. He was thus aware that he could lodge an objection and purposefully declined to do so. We have found waiver in a number of similar instances

when the defendant or his attorney expressly declined to press a right or make an objection. *Cooper*, 243 F.3d at 415; *United States v. Richardson*, 238 F.3d 837, 841 (7th Cir.), *cert. denied*, 532 U.S. 1057 (2001). In *Richardson*, the court asked the defendant's lawyer at a sentencing hearing whether he had an objection to a particular sentencing enhancement, and the lawyer said "no." We found that "[t]his was a waiver in the strict sense of the term, that is, a deliberate relinquishment of a known right. As such it is barred from receiving further judicial consideration." 238 F.3d at 841. *See also United States v. Redditt*, 381 F.3d 597, 602 (7th Cir. 2004) (when trial counsel affirmatively stated that he had no objection to the admission of certain evidence, he has intentionally waived any argument to the contrary); *United States v. Pittman*, 319 F.3d 1010, 1012 (7th Cir. 2003) (defendant waived an issue when trial counsel affirmatively represented that he had no objection to the admission of the evidence). Murry's lawyer clearly and affirmatively stated that he had no objection to the jury instructions. Any objection was therefore waived and appellate review is precluded.

**B.**

We turn to the district court's admission of the summary exhibits. Murry complains that the government did not lay an adequate foundation for the admission of these exhibits because it failed to make the underlying records available to the defense before trial. Exhibits 222 and 223 were admitted into evidence under Federal Rule of Evidence 1006. That rule provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both,

> by other parties at [a] reasonable time and place. The court may order that they be produced in court.

Fed. R. Evid. 1006. Murry argues that making the underlying records available is a foundational requirement for the admission of summaries under Rule 1006. He contends that defense counsel was never provided with a list of the documents on which Kellie Meador, the GE Capital employee who prepared the exhibits, relied in creating Exhibits 222 and 223. Because of this, he continues, the district court abused its discretion in admitting the summary documents.

The government disputes this foundation claim both factually and legally and also argues in the first instance that Murry waived his objections to the admission of the summary charts. As a factual matter, the government points out that nothing in the record supports Murry's claim that the underlying records were not made available to defense counsel prior to trial. Moreover, because Murry did not object at trial to the supposed absence of the underlying records, the government never had an opportunity to demonstrate on the record that it had in fact made the records available. The government contends that no precedent requires the government to demonstrate on the record that it had complied with its pre-trial discovery obligations under Rule 1006. The record on direct appeal cannot resolve this factual dispute regarding whether the government made the underlying documents available to Murry's lawyer before trial.

That deficiency in the record, though, does not preclude us from considering the government's claim that Murry waived his objection to the admission of the summary charts. According to the government, Murry's lawyer did not raise any objections to the charts at trial but instead affirmatively stated he had no objection to the admission of the exhibits. A quick review of the record confirms the government's portrayal of the admission of Exhibits 222 and 223.

During its direct examination of Meador, the government asked a number of foundation-based questions. The prosecutor asked Meador, among other things, what records she used in preparing the exhibits, whether those records were kept in the ordinary course of business, whether the records were created at the time of the events reflected in them, and whether the summary charts accurately summarized GE Capital business records. Tr. at 126-28. In light of Meador's affirmative responses to the key foundational questions, the government moved to admit Exhibits 222 and 223. Tr. at 128. In response to this motion, Murry's attorney stated, "No objection, your Honor." Tr. at 128. Additionally, at sentencing, the government presented two summary charts and the court asked Murry's attorney, "Do you wish to contest the foundation or admissibility of the government's summary charts? One of which was admitted into evidence at trial?" Murry's attorney replied, "Judge, no, those were summaries of the documents. So far as the admissibility, I would have no basis for an objection for that." Sentencing Tr. at 3. Later in the same colloquy, Murry's attorney challenged the weight to be given to the summary exhibits and in particular challenged whether the phone numbers listed on the exhibits truly linked Murry to the crime, but he expressly did not challenge admissibility.

These two exchanges make clear that Murry's attorney knew he could object to the admission of the summary charts and purposefully declined to do so, in the latter instance also expressing the belief that he had no good faith basis to object. Indeed, counsel affirmatively stated he had no objection after the government asked a series of familiar foundational questions. These questions, combined with the court's query, served to put counsel on notice that now was the time to raise foundational objections. He expressly declined to do so. Neither exchange with the court (during trial or at sentencing) could be interpreted as an accidental or negligent omission of an objection, or an apparently

inadvertent failure to assert a right in a timely fashion. We therefore find that Murry waived his objections to the admissibility of Exhibits 222 and 223, and we decline to review the district court's decision. *Redditt*, 381 F.3d at 602; *Pittman*, 319 F.3d at 1012.

## C.

Murry next argues that the district court plainly erred when it allowed Robert Schumann, the government's fingerprint expert, to testify to the contents of Home Depot and Sam's Club business records. According to Murry, Schumann testified about the contents of Exhibits 182, 212, 214 and 216 as business records of Home Depot and Sam's Club. Exhibit 182 is a Home Depot customer pick-up confirmation slip signed by Horatio Jones to acknowledge receipt of a load of hardwood flooring and a power tool. Exhibit 212 is a Sam's Club credit card receipt for general merchandise in the amount of $1911.26. Exhibit 214 is a Sam's Club credit card pre-print checklist together with a photocopy of Darnell Murry's State of Illinois identification card. Exhibit 216 is another Sam's Club credit card receipt for general merchandise in the amount of $330.82. Murry complains that Schumann was not qualified to lay a foundation for these documents as business records. He further contends that Exhibits 212 and 216 were never authenticated. According to Murry, the government never presented any admissible evidence to support a finding that Exhibits 212 and 216 were actually receipts from Sam's Club, and never presented a chain of custody for these exhibits.

At trial, Schumann identified these and other exhibits as documents he had been given to test for fingerprints. Tr. at 259. He testified that for each of these four exhibits, he matched the documents to a list of evidence provided to him by the Secret Service, checking the Secret Service's description of the document to the actual document before testing

for fingerprints. The government points out that these four exhibits were simply originals of photocopied exhibits that had already been admitted into evidence without objection as business records of Sam's Club and Home Depot. When the government moved to admit Exhibits 182, 212, 214 and 216 into evidence (with a larger group of documents examined by Schumann), the court inquired whether Murry's attorney had any objections to admissibility and he replied, "No, your Honor." Once again, after a series of questions that related to foundation, the court solicited objections and Murry's attorney expressly asserted he had no objection to admissibility. Moreover, photocopies of these exhibits had already been admitted into evidence without objection. As with the other instances, we find that Murry waived his objection to the admission of these exhibits. Our review is therefore precluded.

As for the challenges to Schumann's testimony about the content of these exhibits, Murry failed to object to this testimony and we therefore review its admission for plain error only. The transcript reveals that the focus of Schumann's testimony was not on the content of the documents but on the presence of Murry's fingerprints on the papers. Schumann's testimony about the content of the exhibits was limited to comparing the documents to the Secret Service's list describing each piece of evidence to verify that he was reviewing the correct exhibits. He simply verified that he was testing the right piece of paper. We find no plain error in the district court's admission of this testimony.

**D.**

Finally, we consider Murry's argument regarding the amount of restitution ordered by the district court at sentencing. Murry contends that the court lacked the authority to order restitution for uncharged conduct. At trial, Murry argues, the government proved GE Capital's losses to be

$240,968.75. At sentencing, when ordering restitution, the district court added on to that figure an amount representing losses from other conduct, some during the period covered by the indictment and some from outside the time limits of the indictment. According to Murry, restitution ordered under the Mandatory Victim's Restitution Act ("MVRA") is limited to losses caused by the charged conduct. Murry insists that the district court was thus limited in ordering restitution to the losses proved at trial. According to Murry, any other losses were not part of the offense of conviction and the district court lacked authority to order restitution of those amounts.

The government does not contest a limited modification of the restitution order. Murry was charged in a two-count indictment, the first count for interstate transportation of goods obtained by fraud, and the second count for access device fraud. Count Two specifically charged:

> From in or about April 2002 until on or about October 31, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, DARNELL MURRY, defendant herein, did knowingly and with intent to defraud use and cause to be used one or more unauthorized access devices, and by such conduct obtained things of value aggregating $1,000 or more during a one year period, thereby affecting interstate commerce[.]

R. 40. The $240,968.75 proved at trial related to transactions occurring between March 28, 2002 and October 31, 2002. At sentencing, a summary chart prepared by GE Capital and provided by the government showed $654,046.72 in actual losses between December 29, 2001 and October 31, 2002. At the time of his arrest, Murry possessed $3001.50, which the district court ordered applied to restitution at sentencing. The net restitution ordered at sentencing was

$647,054.22.[2] The government now acknowledges that $88,888.11 of those losses related to transactions occurring prior to April 2002, the date charged in the indictment. Without conceding error, the government waives any argument about that amount of restitution for the purposes of the appeal. The government asks that we remand the case so that the district court may adjust the amount of restitution downward by $88,888.11.

At sentencing, Murry did not object to the amount of the restitution ordered. We therefore review this claim for plain error. *United States v. Randle*, 324 F.3d 550, 555 (7th Cir. 2003). The district court ordered restitution pursuant to the MVRA. *See* 18 U.S.C. §§ 3663A and 3664. Section 3664 provides the procedure for issuance and enforcement of an order of restitution. The first step is for the district court to order the probation officer to obtain a complete accounting of the losses to each victim of the crime. 18 U.S.C. § 3664(a). Section 3664 also supplies the procedure for resolving disputes about the appropriate amount of restitution to be ordered:

> Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the government.

---

[2] Both the text of the PSR and the summary chart attached to it list the amount of the actual loss as $654,046.72. For reasons not apparent from the record, the district court stated that the PSR showed actual loss in the amount of $650,046.72, exactly $4000 less than actually reported in the PSR. When the district court calculated the amount of restitution at the sentencing hearing, the court started with the lower figure ($650,046.72) and subtracted the $3001.50 recovered from the defendant to reach the final amount ordered for restitution.

18 U.S.C. § 3664(e). The plain language of this provision belies Murry's claim that the district court was limited to the amount of loss proved at trial in determining the amount of restitution, and we reject that reading of the MVRA. *See United States v. Acosta*, 303 F.3d 78, 89 (1st Cir. 2002) (finding no plain error where the district court included as restitution amounts from transactions suppressed at trial but still part of the offense of conviction).

Although the court is not limited to losses proved at trial, restitution is limited to the losses caused by charged conduct, i.e. the offense of conviction. *Randle*, 324 F.3d at 556; *United States v. Scott*, 250 F.3d 550, 553 (7th Cir. 2001). Restitution may not be ordered for relevant conduct. *Scott*, 250 F.3d at 553; *United States v. Menza*, 137 F.3d 533, 537 (7th Cir. 1998). In Murry's case, the indictment spells out the charged conduct broadly, including multiple uses of unauthorized access devices between April 2002 and October 31, 2002. The Presentence Investigation Report ("PSR") sets forth the losses proved at trial as $240,968.75. Citing the additional summary charts provided to the government by GE Capital during the sentencing phase, the PSR states, "According to the government, the total actual loss combined with the relevant conduct is $654,046.72, and the intended loss was $680,650.00."[3] The probation officer thus recommended that the court order restitution in the amount of the actual losses, $654,046.72. At the sentencing hearing, the

---

[3] Some of Murry's transactions were rejected by the stores before he was able to pick up the merchandise, accounting for some of the difference between the actual and intended losses. The government returned to the stores merchandise seized at the time of the arrest, accounting for the rest of the difference between actual and intended losses. Based on the government's representations and the evidence provided by GE Capital, the probation officer determined the value of the loss for sentencing purposes to be $680,650.00.

district court stated, "The restitution amount originally in the presentence report was $650,046.72. However, that will be reduced because of the application of the seized funds to the restitution amount. What is the balance then due?" The probation officer responded, "$647,045.22." Sentencing Tr. at 26. As we noted above, the record does not reveal the reason for the discrepancy between the actual loss figure given in the PSR and the district court's representation of that number at sentencing; the numbers differ by exactly $4000. In any case, the district court clearly was basing the amount of restitution on the recommendation in the PSR. That recommendation was in turn based on the charts provided by GE Capital.

The probation officer characterized the $654,046.72 total as representing "total actual loss combined with the relevant conduct." The PSR does not specify what part of that loss was caused by the offense of conviction and what part was caused by relevant conduct. The government has already waived any argument relating to $88,888.11 in actual losses sustained before the time period covered by the indictment. It is unclear from the PSR how much of the remaining loss calculation arises from the offense of conviction and how much can be attributed to relevant conduct, and restitution may not be ordered for relevant conduct. We therefore vacate the restitution award and remand to the district court to determine the amount of the loss that may be attributed to the charged conduct, and to adjust the amount of restitution accordingly. Given the government's waiver, the amount of restitution should be reduced by $88,888.11 and then further reduced by any amount that the court concludes was due to relevant conduct rather than the offense of conviction. Finally, the court on remand will have the opportunity to clarify whether the starting figure for actual loss should be $654,046.72 or $650,046.72.

AFFIRMED IN PART, VACATED and REMANDED IN PART.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*