In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3559

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JERAME E. MOORE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:14-cr-40020— **Sara Darrow**, *Judge.*

ARGUED MAY 19, 2015 — DECIDED JUNE 8, 2015

Before POSNER, EASTERBROOK, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Jerame Moore and a crew of three confederates were arrested on the heels of a spending spree that involved their use of counterfeit debit and credit cards at various Walgreens pharmacies across northern Illinois. Moore was subsequently indicted by a grand jury on one count of conspiracy to use and possess counterfeit or unauthorized access devices and one count of possession of at least 15 unauthorized access devices. He pleaded guilty to the latter.

The district court imposed a sentence of 24 months' imprisonment followed by a three-year term of supervised release. On appeal, Moore challenges the district court's calculation of loss underlying his sentence and the procedural soundness of the district court's decision to impose a term of supervised release. We affirm Moore's sentence, but vacate the imposition of a term of supervised release, and remand this case for further proceedings.

## I. Background

On December 24, 2013, Moore and three confederates drove from Chicago to the Quad Cities of western Illinois and eastern Iowa. Along the way, they made purchases at various Walgreens stores. A Walgreens employee in East Moline became suspicious and called the police.

When officers arrived at the store, Moore's confederates left together, while Moore caught a ride to a bus station. Officers encountered Moore at the bus station, he was arrested, and officers seized 25 unauthorized credit and debit cards from his person. Each card was embossed with Moore's name. The others were also arrested after the officers seized 35 cards embossed with their names (and the names of others) from their vehicle. Moore's confederates informed the arresting officers that they had traveled from Chicago to purchase gift cards with the unauthorized cards. The officers subsequently determined that the group had used 8 of the 60 unauthorized cards. One card was used to make more than $500 in purchases, and it did not bear Moore's name. The purchases made with that card totaled $1,016.25.

A federal grand jury returned an indictment that charged Moore and his confederates with conspiracy to use and possess counterfeit or unauthorized access devices (18 U.S.C. § 1029(b)(2)), and charged Moore with intent to defraud while knowingly possessing at least 15 unauthorized access devices (18 U.S.C. § 1029(a)(3)). Moore pleaded guilty to the latter on the condition that the government dismiss the former charge. At his plea hearing, Moore confirmed that none of the account holders or financial institutions where the accounts were established and retained gave him permission to utilize those accounts encoded on the cards, and that he "possessed 25 counterfeit credit cards … [to make] unauthorized purchases," with knowledge that the cards were counterfeit.

The Presentence Report (PSR) prepared by the U.S. Probation Office assigned Moore a base offense level of 6 pursuant to U.S.S.G. § 2B1.1(a)(2). It then determined that the total loss amount was $30,516.25. Probation reached this sum by attributing loss of $500 for 59 of the 60 cards and then adding the actual loss of $1,016.25 spent on the 60th card, resulting in a six-level increase attributable for a loss amount over $30,000. *See* U.S.S.G. § 2B1.1 cmnt. n. 3(F)(i). With the two-level reduction for acceptance of responsibility, Probation calculated Moore's total offense level to be 10, and his criminal history fell into category VI, which resulted in an advisory Guideline range of 24–30 months' imprisonment.

Moore filed objections to Probation's loss calculation. He argued that § 2B1.1 cmnt. n. 3(F)(i) should not apply to counterfeit cards "one comes merely to possess" but should only apply to the counterfeit cards "actually used." Moore also countered that the proper loss calculation was $4,516.25

(applying the $500 per card rule for eight of the nine cards actually used in the offense and then adding the $1,016.25 in actual loss spent on the ninth card). After a full briefing on this issue, the district court rejected Moore's argument and proceeded to sentencing.

At sentencing, the district court adopted the Probation office's recommendations and found that a $500 amount of loss should be attributed to every card involved in the scheme, unless the actual loss incurred by the card was higher. The district court then imposed a sentence of 24 months' imprisonment and a three-year term of supervised release on Moore.

Moore timely appealed. On appeal, he contests the loss calculation enhancement underlying his conviction. He also contests the procedural soundness of his sentence by arguing that the sentencing court failed to make a threshold determination that any term of supervised release was necessary.

## II. Analysis

### A. Amount of loss under § 2B1.1 cmt. n. 3(F)(i)

Moore first contests the loss calculation enhancement underlying his conviction. The sentencing court's determination of the amount of loss is a question of fact that we review for clear error, although the application of the sentencing guidelines is a legal question that we review *de novo. United States v. Mei*, 315 F.3d 788, 792 (7th Cir. 2003).

The commentary following the guideline is an authoritative interpretive aid for how the guideline should be applied. *Id.* As relevant here, Application Note 3(F)(i) to U.S.S.G. § 2B1.1 provides:

> In a case involving any counterfeit access device
> or unauthorized access device, loss includes any
> unauthorized charges made with the counterfeit
> access device or unauthorized access device and
> shall be not less than $500 per access device.

The government argues that the $500 loss amount applies to all unauthorized access devices seized in a case involving unauthorized access devices. Moore counters that this provision (and the $500 loss attribution incident to it) applies only to those unauthorized access devices proven to have been tendered to a vendor in efforts to fraudulently acquire goods or services. So the crux of the parties' dispute is whether the cards must have been used for §2B1.1 cmnt. n. 3(F)(i) to apply.

We apply the plain text of § 2B1.1 cmnt. n. 3(F)(i) and agree with the government that the $500 per unauthorized access device amount of loss attributed under this provision applies to all unauthorized access devices seized in a case. Here: a) Moore pleaded guilty to knowingly and with the intent to defraud possessing at least 15 unauthorized access devices; b) Moore conceded that he and his crew possessed 60 unauthorized access devices, and; c) we recognize that the provision at issue states that a district court may impose a loss amount of $500 per access device "in a case involving any counterfeit access device or unauthorized access device"—*i.e.,* this case. Accordingly, the district court's conclusion that $500 per card is the amount of loss—resulting in a total loss amount of $30,516.25—is correct, and it is appropriate to hold Moore culpable for the full amount of loss found by the district court. Therefore, we affirm Moore's conviction.

### B.  Moore's three-year term of supervised release

Moore also contends that the sentencing court's imposition of a term of supervised release on him without first making the necessary finding that such a term was necessary under the circumstances constitutes procedural error. In the supervised release context, we review allegations of procedural error *de novo*. *United States v. Baker*, 755 F.3d 515, 522 (7th Cir. 2014).

Moore is correct that before it imposes a term of supervised release, the sentencing district court must first make a finding that it is necessary under the circumstances. *United States v. Thompson*, 777 F.3d 368, 372 (7th Cir. 2015) ("Supervised release is required by statute in fewer than half of cases subject to the sentencing guidelines."). We agree with Moore that in this instance, the district court imposed a term of supervised release without first enunciating its finding that a term of supervised release was necessary. Accordingly, we vacate Moore's sentence and remand this case for further proceedings. On remand, the sentencing district court should consult our recent discussions of supervised release, including *United States v. Kappes*, 782 F.3d 828 (7th Cir. 2015), *Thompson, supra,* and *United States v. Siegel*, 753 F.3d 705 (7th Cir. 2014).

### III. Conclusion

The district court properly calculated the loss underlying Moore's sentence. Accordingly, we AFFIRM Moore's conviction. However, the district court failed to first determine that a term of supervised release was warranted before imposing a three-year term of it on Moore. Therefore, the imposition of Moore's sentence was procedurally unsound, so we VACATE his sentence and REMAND this case for further proceedings.